**FILED**
**FEB 12, 2015**
In the Office of the Clerk of Court
WA State Court of Appeals, Division III

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| ANA ZAVALA, | ) | |
| | ) | No. 31854-1-III |
| Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| TWIN CITY FOODS, | ) | PUBLISHED OPINION |
| | ) | |
| Respondent. | ) | |

FEARING, J. — The Board of Industrial Insurance Appeals closed Ana Zavala's

industrial insurance claim, which ruling the Franklin County Superior Court affirmed.

Zavala appeals and asks this court to reopen her claim or, in the alternative, to increase

her disability rating. The appeal requires discussion of the "lit up" doctrine under

workers' compensation law. Zavala primarily argues that her testimony and the

testimony of friends and family that she experienced no pain before her work injury

requires the trial court to find that she suffered from no preexisting condition, despite

medical testimony to the contrary. Because the trial court has the discretion to believe

the testimony of physicians over lay witnesses and because we defer to the trial court's

findings, we affirm the superior court.

## FACTS

On September 17, 2007, Ana Zavala, then age 52, injured her left knee in the

course of employment with Twin City Foods. Zavala testified concerning the

circumstances of the injury:

> I was cleaning an area, and my supervisor said, "This area needs to
> be clean in 15 minutes, it has to be very clean," and I was hurrying up. I
> was putting chlorine and soap and I was washing the area quickly, and I hit
> my knee, and ever since then I have not been able to walk.

Administrative Record (AR) at 461. Zavala hit her knee against the flat edge of a tub.

Zavala finished her work on September 17, but then went to Lourdes Occupational Clinic

for an assessment.

In October 2007, orthopedic surgeon Christopher Kontogianis examined Ana

Zavala. An October 3, 2007, magnetic resonance imaging (MRI) showed fluid in her left

knee, a tear of the posterior horn of the medial meniscus, and a complete tear of the

medial collateral ligament from the tibial insertion. A meniscus is a "c"-shaped cartilage

disk found in the knee. The medial meniscus lies on the inner side of the knee, and the

lateral meniscus rests on the outer side of the knee. The menisci serve a critical function

in the knee as a shock absorber or cushion, thereby minimizing the stress on the articular

cartilage. The posterior horn is in the back ridge or bend of the meniscus. The medial

2

collateral ligament is one of four major ligaments critical to the stability of the knee joint. This ligament spans the distance from the end of the femur to the top of the tibia and lies inside the knee joint.

On November 19, 2007, Ana Zavala applied for workers' compensation benefits with the Department of Labor and Industries. The department approved Zavala's claim and ordered Twin City Foods to pay all medical and time-loss compensation benefits for the industrial injury.

Dr. Christopher Kontogianis performed arthroscopic surgery to repair Zavala's left knee on November 21, 2007. The arthroscopy revealed significant degenerative change in the knee, diagnosed as osteoarthritis. Kontogianis injected Synvisc, an artificial lubricant, into Zavala's knee to treat her osteoarthritis.

Ana Zavala received time-loss compensation through April 27, 2008. On June 16, 2008, the department closed Zavala's claim because the covered medical condition was stable. The department then ordered Twin City Foods to pay Zavala a permanent partial disability (PPD) award of ten percent of the amputation value of the left leg above the knee joint.

On July 18, 2008, Ana Zavala protested the closing of her claim by the Department of Labor & Industries. The department held its June 16 order in abeyance beginning November 7, 2008. The department cancelled this abeyance and reopened Zavala's claim on December 5, 2008.

PROCEDURE

The department again closed Ana Zavala's claim on August 21, 2009. This closure recognized the same time-loss compensation, paid through April 27, 2008, and the same ten percent permanent partial disability award. Zavala again protested the closure, and the department cancelled the August 21 closure on October 30, 2009. Twin City Foods appealed the cancellation of the closure.

The Board of Industrial Insurance Appeals conducted a hearing on Twin City Foods' appeal on September 30 and November 1, 2010. At the hearing, Ana Zavala, her son Jose Zavala, her coworkers Maria Martinez and Josefina Vargas, her friend from childhood Floretino Ledesma, and friend from church Irma Mendoza testified. All testified that Zavala showed no signs of pain or injury prior to her September 17, 2007 injury. All testified that following her September 17, 2007 injury, Zavala limped and her knee visibly caused her pain.

The board considered testimony from four orthopedic surgeons. Twin City Foods called Christopher Kontogianis, Patrick Bays, and Larry Iversen to testify. Ana Zavala called Thomas Gritzka to testify.

Dr. Christopher Kontogianis testified that the November 21, 2007, arthroscopy revealed "significant degenerative change in her knee, as well as a torn medial meniscus." AR at 507. Kontogianis attributed the medial meniscal tear to Zavala's September 17 injury. Kontogianis diagnosed the significant degenerative change as

4

arthritis and near grade 4 chondromalacia, meaning near bone on bone contact on one side of Zavala's knee joint. Kontogianis believed the degenerative arthritis and chondromalacia existed prior to the September 17, 2007, industrial injury. Kontogianis continued:

> Q. Based on the surgery you did in November 2007, would someone with those type of degenerative findings have what we term a symptomatic knee prior to her September industrial injury?
> A. Most likely.
> Q. And why is that?
> A. Why would somebody have symptoms from having severe degenerative arthritis of the knee?
> Q. Yeah.
> A. Because it hurts.

AR at 512.

Christopher Kontogianis testified that the industrial injury temporarily aggravated the preexisting arthritis, but Zavala became "mostly fixed and stable" as of March 2008. AR at 510. Dr. Kontogianis reviewed a June 4, 2009, independent medical exam report and agreed that no further medical intervention for her industrial condition was needed. Kontogianis rated Zavala's knee as ten percent disabled. Kontogianis and Zavala discussed the possibility of a total knee replacement, but Kontogianis believed any need for such replacement was not related to Zavala's industrial injury.

Dr. Patrick Bays examined Ana Zavala on April 17, 2009, and he reviewed reports from doctors who treated Zavala. Zavala reported, to Dr. Bays, pain and numbness throughout her leg. On a scale of one to ten, Zavala rated her pain at ten. Bays assessed

5

Zavala's major nerves to the brain as normal, Zavala's motor strength in the left leg as five out of five, and Zavala's deep tendon reflexes as normal. Zavala complained of global sensory deficit, yet told Bays that her entire leg was sensitive to touch. AR at 541, 549. Bays found this symptom strange, testifying:

> Now, that can happen with certain types of conditions, such as an amputation or a severe circumferential nerve injury, where you've traumatized all of the nerves around an entire limb, but it is completely nonanatomic or it does not fit a normal known anatomic pathway if somebody doesn't have that type of an injury and yet they complain of global sensory deficit. So for us that's another red flag. That means that what the patient is experiencing and telling us does not fit with any known normal anatomic pathway. It doesn't fit with science. It doesn't fit with medical documentation and acumen that we know of.

AR at 542.

Dr. Bays testified that, during the examination, Zavala walked with a limp when aware that Bays observed her but without a limp when unaware of being watched. Bays believed that Zavala's "obvious symptom magnification would be completely and wholly unrelated to the subject injury of September 17th of 2007, on a more-probable-than-not basis." AR at 552.

According to Patrick Bays, an earlier MRI showed swelling in Zavala's left knee. But at the April 17, 2009 examination, Bays found "no evidence of an effusion or swelling anywhere around the left knee joint." AR at 547. Dr. Bays reviewed a September 27, 2007 x-ray, an October 3, 2007 MRI, September 30, 2008 x-ray, and Dr. Kontogianis's report. Bays opined:

It would be a virtual impossibility to develop the arthritic changes that were identified on the imaging studies within that timeframe. Degenerative changes such as those that were displayed by Ms. Zavala would have taken years and years to have developed. And so it would have been an impossibility for those imaging studies to have been caused by a work injury of 9-17-2007.

. . . .

Typically, wear-and-tear arthritis, that has happened over a long period of time, typically one's lifetime, will affect all three compartments. And that's exactly what happened in this case. There was grade three to four chondromalacia to all three of those compartments. Again, this is a wear-and-tear arthritis, age related, nontraumatic in nature. These arthritic changes were occurring over many, many years and had absolutely nothing to do with bumping the knee at the time of injury.

. . . .

My final diagnosis was that of a left knee medial and lateral meniscus tear, status post left knee arthroscopic partial medial and partial lateral menisectomy.

AR at 552.

Dr. Bays testified that neither the industrial injury nor Dr. Kontogianis' surgery worsened or accelerated Ana Zavala's arthritis. Bays continued:

Q. If the Judge or board in this case finds that the September 17, [2007] injury lit up a prior asymptomatic knee joint and there was some aggravation in this case, would you think that that aggregation [sic] was temporary or permanent, as it relates to Ms. Zavala?
A. Well, in my opinion, there was no aggravation, first of all, of the preexisting arthritic process. I don't even think that the, in my opinion, that the meniscus tears were caused by the subject mechanism of injury. Having said that, I would say that if in fact it is confirmed that there was an aggravation of a preexisting left knee condition, in my opinion that aggravation would be reflective only of the meniscus tears, which in my opinion were preexisting, and not of the arthritic condition. The meniscus tears, the aggravation was dealt with arthroscopically. The torn portion of the menisci was removed. The remainder of the menisci was entirely normal. And so at that point the temporary aggravation would have abated

7

and she was left with an impairment that involved only the meniscus that was taken out. That would be a 10 percent impairment. There was no impairment related to the preexisting arthritis, in my opinion.

AR at 562-63. Dr. Bays added:

> A.    . . . Degenerative arthritis is more of a wear-and-tear arthritis that happens over the course of time throughout one's natural life, where as a true inflammatory arthritis would be more consistent with a rheumatoid arthritis, would be more consistent with a gouty arthritis, and not as consistent with a degenerative arthritis.
>
> . . . .
> Q.    Is it possible that an injury, such as—that Ms. Zavala experienced, could aggravate or exacerbate osteoarthritis or at least the symptoms of osteoarthritis?
> A.    No.
> Q.    Is it possible for a person with osteoarthritis to be completely asymptomatic one day and then the very next day experience major adverse outcomes or adverse status with respect to activities of daily living?
> A.    No.
> Q.    Is it possible for a person with osteoarthritis to one day be completely asymptomatic, with respect to pain, and then the next day experience great levels of pain?
> A.    No.

AR at 574-76.

Dr. Patrick Bays refrained from commenting on whether Zavala was symptomatic prior to her industrial injury pointing to the lack of a "paper trail." AR at 563. Bays testified, however, that someone with Zavala's arthritic degradation could be without symptoms. Dr. Bays further declared that less than ten to fifteen percent of patients go from completely asymptomatic to requiring a total knee replacement within two to three years. Bays believed Zavala's industrial injury was fixed and stable when he examined

8

her.

Dr. Bays testified to Ana Zavala's permanent impairment by reason of her work injury. He stated: "Using the American Medical Association Guidelines, 5th edition, and citing the specific tables, if one undergoes a partial medial and a partial lateral menisectomy, it is automatically a 10 percent impairment to the left lower extremity." AR at 564. Bays opined that Zavala does not need a total knee replacement, nor any other treatment. According to Dr. Bays, Zavala needs no treatment because her complaints are unrelated to "a normal scientific arthritis problem." AR at 566.

Dr. Larry Iversen evaluated Ana Zavala on December 29, 2009. As part of that evaluation, Iversen reviewed a plethora of records related to Zavala's injury, including medical chart notes, other physicians' independent evaluations, and x-rays. Based on those records, Iversen believed that Zavala suffered from severe osteoarthritis prior to her September 17, 2007 industrial injury. "In her case, it's the degenerative arthritis that occurs as one gets older. And, in lay terms, it is a wear-and-tear type of the cartilage in the knee joint." AR at 710. Dr. Iversen testified that this arthritis and Zavala's work injury were not related, in part, because of a lack of bruising from the industrial injury.

Dr. Larry Iversen testified to a belief that Ana Zavala failed to report a previous injury:

> The MRI that was done in October 2007, showed that this ligament had been pulled off or stripped off or completely ruptured off the tibia. This is a significant injury. This requires a violent force, usually from the

lateral side of the knee, pushing the knee towards the other side to cause that to get pulled loose. Interestingly, is usually we don't have to operate on those, because they reattach themselves with time. In her case, the injury and the violence was enough that it never did reattach, so I'm convinced there is something that happened in the past that we don't know about that's injured that knee.

AR at 711-12.

Dr. Iversen further testified:

> Q. Now, have you formed an opinion, based on a more-probable-than-not basis, as to whether the industrial injury of September 17, 2007, somehow aggravated or lit up the underlying degenerative condition in the knee, the left knee?
> A. I have.
> Q. What is that opinion?
> A. I'm trying to give her the benefit of the doubt. I will opine that the industrial incident of September 2007, caused a temporary subjective exacerbation of her preexisting arthritis, but did not cause a permanent aggravation of her preexisting knee arthritis.
> Q. Why do you make that distinction between temporary and permanent?
> A. It's certainly possible that banging her knee on the edge of this apparatus could have stirred up her arthritis on a temporary basis, but I don't think we have any even objective evidence that this accident has caused a permanent aggravation. For example, comparing the x-rays from 2007 to 2008, even though one is weight bearing and one is not, there's essentially the same degree of arthritis a year later. So there's no objective evidence of acceleration or aggravation of her knee arthritis by this episode.
> Q. Have you formed an opinion, based on a more-probable-than-not basis, whether Ms. Zavala would have required additional medical treatment as a result of the industrial injury as of August 21, 2009?
> A. I have.
> Q. What is that opinion?
> A. In my orthopedic opinion, she would not require additional medical or surgical treatment for residuals of her September 2007 industrial incident.
> Q. Why do you say that?

A. Her accepted conditions of torn menisci in her knee would have reached maximum medical improvement within two or three months of her surgery. Any temporary exacerbation of her knee arthritis would have settled down the same length of time. Any persisting problems after that, in my opinion, relate to her preexisting knee osteoarthritis and probably to some unreported prior trauma.

Q. And would that opinion also be true as of October 30, 2009?

A. Yes.

Q. Have you formed an opinion, based on a more-probable-than-not basis, as to the permanent impairment due to the industrial injury as of August 21, 2009?

A. I have.

Q. And what would your opinion be as to the permanent impairment due to the industrial injury as of August 21, 2009?

A. Using the AMA Guides to the Evaluation of Permanent Impairment, 5th edition, she rates a 10 percent permanent partial impairment of her left lower extremity, as compared to the amputation value at or above the knee level.

Q. How do you arrive at that 10 percent?

A. That is what the guidelines recommend for somebody who has had partial menisectomies of the medial and lateral meniscus of the same knee.

Q. Would that opinion, with regard to permanent impairment, be true as of October 30, 2009?

A. Yes.

Q. Assuming Ms. Zavala needs treatment in the future with namely a total knee replacement or further surgery on the left knee, in your opinion, would that be related in any way to the industrial injury, dated September 17, 2007, on a more-probable-than-not basis?

A. No.

Q. Why not?

A. Again, it's my opinion that she did not suffer any permanent aggravation or acceleration of her preexisting left knee degenerative osteoarthritis by this industrial incident; therefore, any surgery for the arthritis in her knee, such as a total knee replacement, in the future would not be related to the industrial claim.

AR at 692-95.

11

Dr. Larry Iversen believed that Zavala exaggerated her symptoms. Zavala reported pain in her back and right knee, which she attributed to her industrial injury. Zavala was very sensitive to touch from her lower back to her left foot. Dr. Iversen testified that Zavala exaggerated lurching. Iversen believed that many of Zavala's reported symptoms did not comport with her physical state. Iversen stated: "She had so much weakness that she was trying to demonstrate to me." AR at 681. Dr. Iversen found no swelling and very little tenderness in her knees.

Dr. Iversen reported:

> And then after she left the exam room, I watched her walk down the hallway, at the Richland Medical Consultants Network office, and she walked with much more speed, bounce, and alacrity than I observed her during the course of her actual directed physical examination.

AR at 685-86.

Dr. Thomas Gritzka examined Ana Zavala on August 6, 2009. Gritzka reviewed Zavala's medical records to date. During the examination, Zavala complained of a numbness in her left leg. Beyond the tearing in her left knee, Dr. Gritzka agreed that Zavala suffered from osteoarthritis. Gritzka described how tearing might contribute to arthritis:

> Well, if you tear your meniscus and you have to—first of all, if you don't do anything, you tear it and you leave it there, then these torn parts of the meniscus grind around inside the knee and they tend to abrade and destroy the articular cartilage or the gristle on the knee, so you don't want to leave a torn meniscus untreated.

12

On the other hand, if you take the whole meniscus out, then you lose all these protective functions, and removing the meniscus totally may lead, typically did lead when this was a common procedure, to arthritis of the knee joint over time. So the current practice is to take out the torn part and leave as much as you can, but what you end up with is sort of a partial solution in that you don't lose all the function of the meniscus but you lose some of it, and you lose some of the protective shock absorbing function, some of the stabilizing function, some of the lubricant function, and so the knee is then at risk to either develop and accelerate osteoarthritis if there is already arthritic changes in the knee before the partial meniscectomy was done, or in some cases even if there is no arthritis, after a partial meniscectomy, a patient progresses to develop arthritis over time.

So that's the situation with Ms. Zavala. She had not just one but both menisci removed, so this created an increased risk factor to develop osteoarthritis of the knee.

AR at 611-12.

Dr. Thomas Gritzka agreed that Ana Zavala's osteoarthritis preexisted her industrial industry, but opined that Zavala's surgery accelerated the need for a total knee replacement:

Well, if there is already an osteoarthritic process there, it accelerates, it hastens the end result of bone on bone. It brings it on sooner than it would have happened or maybe never would have happened, but sooner than it would have had happened if no meniscectomy had been done.

. . . .

In any case, the meniscectomy accelerated the degenerative process and caused this bone-on-bone phenomenon to occur sooner than it would have if she would not have had the meniscectomy.

AR at 615-16.

Dr. Gritzka testified that often someone suffers from severe arthritis without symptoms before a traumatic injury. Gritzka testified:

13

> Q.   Is it possible to look at such an image and predict how well the patient is functioning with that knee, for example?
>
> A.   No. Sometimes people do function surprisingly well even with terrible looking images.

AR at 621-22. Dr. Gritzka declared: "Regardless of causation, she needs a left total knee arthroplasty. She needs to have a left knee replacement done on her left knee," concluding that Zavala is not fixed and stable. AR at 630.

Based on bone-on-bone contact in Ana Zavala's left knee, Dr. Gritzka rated her impairment at 50 percent:

> Well, based on the report that she has bone-on-bone contact in her left lower extremity according to the standard impairments of the "American Medical Association Guides to the Evaluation of Permanent Impairment, Fifth Edition," which is the version that the Washington Department of Labor and Industries uses, bone-on-bone contact in the knee is equal to 50 percent impairment of the lower extremity, so based on that report, she has a significant impairment of her left lower extremity.

AR at 632. Gritzka conceded that some of Zavala's symptoms did not "correlate well with the objective data, such as her x-rays and so forth there." AR at 642.

On January 14, 2011 Judge James Rickman entered a proposed decision and order which affirmed the reopening of Ana Zavala's claim. On March 2, Twin City Foods petitioned the board to review Judge Rickman's proposed decision. The board granted this review on March 15, 2011. On March 31, 2011 the board reinstated the department's August 21, 2009 closure of Zavala's claim.

14

Ana Zavala appealed the board's decision to Franklin County Superior Court. On July 24, 2013, the trial court sent a letter ruling to the parties, which reads, in part:

Here, I am mindful that the Board's decision is prima facie correct under RCW 51.52.115 and Ms. Zavala, as the party attacking the decision, must support her challenge by a preponderance of the evidence. *See* Ruse vs. Dept. of Labor & Industries, 138 Wn.2d 1, 977 P.2d 570(1999). However, I also recognize that my review is de novo. RCW 51.52.115. As I understand this case, boiled down to the bottom line, Ms. Zavala wants her employer to pay for a total knee replacement. In support of this request, Ms. Zavala claims that her industrial injury lit up her pre-existing though latent/asymptomatic osteoarthritis and/or the industrial injury proximately caused her to need a knee replacement.

First, has Ms. Zavala established that her arthritis was lit up? McDonagh and Wendt provide that where there is substantial evidence to support the doctrine/ theory, the jury should be instructed on it (or in this case, I should consider it). *See* McDonagh vs. Dept. of Labor & Industries, 68 Wn. App. 749, 754, 845 P.2d 1030(1993); Wendt vs. Dept. of Labor & Industries, 18 Wn. App. 674, 676, 571 P.2d 229(1977). My job then is to review the record and determine whether or not Ms. Zavala presented substantial evidence such that the doctrine/theory should have been considered by the Board. Here, the Board apparently did not believe Ms. Zavala's arthritic knee condition was lit up by her industrial injury.

As pointed out, a pre-existing condition is not lit up if the weight of the evidence reveals the following: 1) that the condition was symptomatic before the workplace event, or 2) the condition was a naturally progressing condition that would have progressed to symptoms without the injury. Austin vs. Dept. of Labor & Indus., 6 Wn. App. 394, 492 P.2d 138[2], 1384-5(1971).

From my perspective, after carefully reviewing the record, it is my opinion that Ms. Zavala did not establish that her condition was latent, quiescent or asymptomatic before the workplace event/industrial injury. Ms. Zavala relies on several many lay witnesses to make her case. These lay witnesses essentially testified that Ms. Zavala did not appear to be in pain or limp prior to the industrial injury and after the industrial injury, she appeared to be in pain and walked with a limp. However, a careful review of the record shows that the witnesses had limited observations of Ms. Zavala. Those with more detailed observations include Ms. Zavala's son,

who might be expected to testify favorably on his mother's behalf. *See* discussion in Defendant's Response to Plaintiff's Brief at pages 24 - 27.

Additionally, the weight of the medical testimony does not support Ms. Zavala. The preponderance of the medical testimony is that Ms. Zavala's knee was symptomatic before the industrial injury. While it is true that there were no lay witness who testified that Ms. Zavala's arthritis was symptomatic before the industrial injury, it was not up to the employer to produce such testimony as was argued by Ms. Zavala at her trial. Ms. Zavala had the burden to produce substantial evidence before the Board that her lighting up theory should be considered by the Board and thus by this court. Ms. Zavala did not sustain her burden of proof on this issue before the Board and I agree.

Dr. Kontogianis was Ms. Zavala's treating physician. As such, I am mindful that he is entitled to special consideration by me. Additionally, I am mindful, that he had a unique perspective, in that he actually operated on Ms. Zavala's knee. It was Dr. Kontogianis' opinion that given the degree of her pre-existing arthritis, more probably than not, based on his observations and clinical experience, Ms. Zavala had symptoms prior to her industrial injury. Likewise, Dr. Iverson and Bays testified to the same. The weight of the medical experts testimony establishes that Ms. Zavala's left knee was symptomatic prior to her industrial injury of September 17, 2007.

Another point noted with regards to the medical testimony is that Drs. Iverson, Bays and Gritzka all questioned to some extent Ms. Zavala's presentation during examination providing the doctors with concern as to whether or not she was an accurate historian. Also, the medical experts noted a previous knee injury not disclosed by Ms. Zavala, a torn MCL and a tibial bone contusion. All of the medical experts agreed that such injuries would only occur through a violent force, not the mild force Ms. Zavala described as occurring on September 17, 2007, the date of her industrial injury.

Despite the fact that I have rejected Ms. Zavala's theory that the workplace injury "lit up" her arthritis, the next issue for me to decide is whether or not Ms. Zavala establishes that the industrial injury/workplace event caused a temporary and/or permanent effect on her preexisting osteoarthritis such that she needs to have her knee replaced?

With regards to the medical experts, of the four who testified, only two believed that Ms. Zavala needed her left knee replaced. Both Drs. Kontogianis and Gritzka testified that Ms. Zavala needed her left knee replaced. However, Dr. Kontogianis concluded that the industrial event did

not cause the need for Ms. Zavala to replace her knee. Dr. Gritzka, while testifying that Ms. Zavala needed to have her left knee replaced, did not testify that this procedure is needed as a result of the industrial injury, rather, he testified that regardless of causation, Ms. Zavala needed her left knee replaced. Regardless of whether or not I accept Ms. Zavala's argument that Dr. Gritzka was testifying as a whole to a reasonable degree of medical certainty, I am still not persuaded and I do not find that Ms. Zavala establishes by a preponderance of the evidence that the industrial injury proximately caused the need for a total knee replacement on Dr. Gritzka's testimony alone.

Drs. Kontogianis, Bays, and Iverson all testified that the industrial injury only temporarily aggravated her pre-existing osteoarthritis. Only Dr. Gritzka testified to the contrary. From this medical testimony it is clear that Ms. Zavala does not establish that the industrial injury proximately caused the need for her knee to be replaced.

From my perspective, I am also most concerned with the medical testimony that establishes that Ms. Zavala had a medial collateral ligament in her left knee that was torn from her tibia by a violent trauma and a tibial bone contusion that occurred prior to her workplace injury. Further the medical testimony establishes that these observations could not have occurred absent a violent trauma. Ms. Zavala did not provide any history to the doctors to support these findings. Clearly, there is a basis to conclude that Ms. Zavala is not an accurate historian.

For all of the above reasons, I am upholding the [B]oard decision.

Clerk's Papers (CP) at 11-13 (italics omitted).

The trial court entered a judgment and order affirming the board. The court also entered findings of fact and conclusions of law. Zavala challenges the following findings and conclusions:

## FINDINGS OF FACT

. . . .

2. On September 17, 2007, while in the course of her employment with Twin City Foods, Inc., Ms. Zavala experienced a sudden and tangible happening when, while cleaning and washing a work area, she struck her left knee. The event produced immediate pain in her left knee. This

condition was diagnosed as a partial tear of the left medial meniscus, and was surgically repaired in an arthroscopic procedure on November 21, 2007, by Christopher Kontogianis, M.D.

3. Ana Zavala, prior to her industrial injury of September 17, 2007, had extensive preexisting degenerative or arthritic conditions in her left knee described as left knee osteoarthritis and grade 4 chondromalacia of the left femoral condyle.

4. Ana Zavala's pre-existing left knee osteoarthritis and chondromalacia of the left femoral condyle were not caused by her industrial injury of September 17, 2007, and the industrial injury did not aggravate or accelerate these extensive pre-existing left knee conditions.

5. Ana Zavala's partial tear of the medial meniscus of the left knee was not in need of further proper and necessary medical treatment as of the date of the Department order on appeal, October 20, 2009.

6. Ana Zavala sustained a permanent partial disability proximately caused by the industrial injury of September 17, 2007, described as 10 percent of the amputation value of the left leg above the knee joint with short thigh stump (3 inches or below the tuberosity of the ischium).

## CONCLUSIONS OF LAW

1. The Board of Industrial Insurance Appeals has jurisdiction over the parties to and the subject matter of this appeal.

2. The condition caused by the industrial injury of September 17 2007, did not require further proper and necessary medical treatment within the meaning of RCW 51.36.10, as of October 30, 2009,

3. Ana Zavala sustained a permanent partial disability within the meaning of RCW 51.32.080, equal to 10 percent of the amputation value of the left leg above the knee joint with short thigh stump (3 inches or below the tuberosity of the ischium).

4. The Department order dated October 30, 2009, is incorrect. This matter is remanded to the Department with directions to issue an order in which it denies responsibility for the conditions described as left knee osteoarthritis and Grade 4 chondromalacia of the left femoral condyle and to close the claim as otherwise set forth on the order of August 21, 2009, with time loss compensation benefits paid through April 27, 2008, and with an award of permanent partial disability of 10 percent of the amputation value of the left leg above the knee joint with short thigh stump (3 inches or below the tuberosity of the ischium.)

18

CP at 6-7.

## LAW AND ANALYSIS

### *Standard of Review*

Ana Zavala argues that this court should not defer to the trial court's findings of fact since the trial court heard no live witnesses. The trial court instead reviewed the record before the board.

In other settings, Washington courts have held that a reviewing court need not defer to the trial court's factual findings, when the lower court does not conduct an evidentiary hearing. In an early decision, the Supreme Court noted the earlier workers' compensation board was in no better position to weigh and consider the testimony than was the superior court or the appellate court, since the board also reviewed a transcript of the testimony. *Cheney v. Dep't of Labor & Indus.*, 175 Wash. 60, 62, 26 P.2d 393 (1933). Nevertheless, the rule is the opposite in the setting of appeals from the superior court in industrial insurance claims.

This court previously addressed Ana Zavala's contention in *Weatherspoon v. Department of Labor and Industries*, 55 Wn. App. 439, 777 P.2d 1084 (1989). The employer argued that, since the court reviews an administrative action and the findings of the trial court are based solely on the transcript of the administrative hearing and other exhibits, the appellate court is not bound by the trial court findings and is as competent as the superior court to weigh and consider the evidence. This court rejected the argument

based on Supreme Court precedent and RCW 51.52.140. The statute directs that such appeals lay from the judgment of the superior court as in other civil cases.

In the superior court, Ana Zavala had the burden of proving the board's findings and decision were not prima facie correct. *Potter v. Dep't of Labor & Indus.*, 172 Wn. App. 301, 310, 289 P.3d 727 (2012), *review denied*, 177 Wn.2d 1017 (2013). In reviewing the superior court's decision, the role of the court of appeals is to determine whether the trial court's findings are supported by substantial evidence and whether those findings support the conclusions of law. *Eastwood v. Dep't of Labor & Indus.*, 152 Wn. App. 652, 657, 219 P.3d 711 (2009); *Tomlinson v. Puget Sound Freight Lines, Inc.*, 166 Wn.2d 105, 109, 206 P.3d 657 (2009). Substantial evidence exists if there is a sufficient quantity of evidence in the record to persuade a fair-minded, rational person of the truth of the stated premise. *Eastwood*, 152 Wn. App. at 657. We must review the record in the light most favorable to the party who prevailed in superior court. *Harrison Mem'l Hosp. v. Gagnon*, 110 Wn. App. 475, 485, 40 P.3d 1221 (2002). We do not weigh or balance the competing testimony and inferences, or apply anew the burden of persuasion. *Gagnon*, 110 Wn. App. at 485.

A memorandum opinion may be considered as supplementation of formal findings of fact and conclusions of law. *Ellerman v. Centerpoint Prepress, Inc.*, 143 Wn.2d 514, 523 n.3, 22 P.3d 795 (2001). In such cases, this court reviews the trial court's letter opinion, findings and conclusions, and judgment as a whole. *See, e.g., Mestrovac v.*

*Dep't of Labor & Indus.*, 142 Wn. App. 693, 702, 176 P.3d 536 (2008), *affirmed on other grounds by, Kustura v. Dep't of Labor & Indus.*, 169 Wn.2d 81, 233 P.3d 853 (2010); *see also, Tae T. Choi v. Samuel Y. Sung*, 154 Wn. App. 303, 317, 225 P.3d 425 (2010).

### *The Lit Up Doctrine*

Ana Zavala argues that the trial court erroneously applied Washington's workers' compensation "lit up" doctrine. Since the response to this assignment of error influences our review of Zavala's assignments with regard to discrete findings of fact and conclusions of law, we now discuss the doctrine based on the Christmas tree metaphor. We will examine the findings and conclusions later.

The Industrial Insurance Act (Act), Title 51 RCW, was the result of a compromise between employers and workers. In exchange for limited liability the employer would pay on some claims for which there had been no common law liability. The worker gave up common law remedies and would receive less, in most cases, than he would have received had he won in court in a civil action, and in exchange would be sure of receiving that lesser amount without having to fight for it. *Dennis v. Dep't of Labor & Indus.*, 109 Wn.2d 467, 470, 745 P.2d 1295 (1987).

RCW 51.04.010 embodies these principles, and declares, among other things, that "sure and certain relief for workers, injured in their work, and their families and dependents is hereby provided [by the Act] regardless of questions of fault and to the exclusion of every other remedy." To this end, the guiding principle in construing

21

provisions of the Industrial Insurance Act is that the Act is remedial in nature and is to be liberally construed in order to achieve its purpose of providing compensation to all covered employees injured in their employment, with doubts resolved in favor of the worker. RCW 51.12.010; *Sacred Heart Med. Ctr. v. Carrado*, 92 Wn.2d 631, 635, 600 P.2d 1015 (1979).

Washington courts have held in an unbroken line of decisions that if an industrial injury lights up or makes active a latent or quiescent infirmity or weakened physical condition occasioned by disease, then the resulting disability is to be attributed to the injury, and not to the preexisting physical condition. *Dennis v. Dep't of Labor & Indus.*, 109 Wn.2d at 471; *Miller v. Dep't of Labor & Indus.*, 200 Wash. 674, 682, 94 P.2d 764 (1939); *Austin v. Dep't of Labor & Indus.*, 6 Wn. App. 394, 395, 492 P.2d 1382 (1971). Washington courts have restated this principle of law in other language. Ordinarily the previous physical condition of the worker is immaterial and recovery may be had for the full disability independent of any preexisting or congenital weakness if the worker's prior physical condition is not deemed the cause of the injury but merely a condition on which the real cause operated. *Tomlinson v. Puget Sound Freight Lines, Inc.*, 166 Wn.2d at 117; *Bennett v. Dep't of Labor & Indus.*, 95 Wn.2d 531, 533, 627 P.2d 104 (1981).

The worker whose work injury acts upon a preexisting disease to produce disability where none existed before is just as injured in his or her employment as is the worker who contracts a disease as a result of employment conditions. *Dennis*, 109

22

Wn.2d at 471. Benefits are not limited to those workers previously in perfect health. *Groff v. Dep't of Labor & Indus.*, 65 Wn.2d 35, 44, 395 P.2d 633 (1964). The worker is to be taken as he or she is, with all his or her preexisting frailties and bodily infirmities. *Dennis*, 109 Wn.2d at 471; *Wendt v. Dep't of Labor & Indus.*, 18 Wn. App. 674, 682-83, 571 P.2d 229 (1977).

Ana Zavala contends that, if she had no symptoms in her knee before the industrial injury, she is entitled as a matter of law to recovery for all symptoms thereafter and all medical treatment needed thereafter even if her preexisting condition contributed to the symptoms. The law is not that helpful.

There remain limits to recovery. In order for a claimant to recover under the workers' compensation act, she must establish a causal connection between the work injury and the subsequent physical condition. *Jacobson v. Dep't of Labor & Indus.*, 37 Wn.2d 444, 448, 224 P.2d 338 (1950). A given disability must be the result of injury rather than solely of a preexisting infirmity. *Jacobson*, 37 Wn.2d at 448. The employee must minimally show that the employment was more likely than not a contributing factor to the injury. *Harbor Plywood Corp. v. Dep't of Labor & Indus.*, 48 Wn.2d 553, 557, 295 P.2d 310 (1956). A preexisting condition is not lit up if the weight of the evidence reveals that the condition was a naturally progressing condition that would have progressed to the same symptoms without the injury. *Matson v. Dep't of Labor & Indus.*, 198 Wash. 507, 516, 88 P.2d 825 (1939); *Austin*, 6 Wn. App. at 398.

23

In many decisions, Washington appellate courts affirm trial court decisions and jury verdicts in favor of the employee to the effect that the work injury caused the employee's entire disability, despite the injury triggering a preexisting condition. *Dennis*, 109 Wn.2d at 471; *Bennett*, 95 Wn.2d at 533; *Harbor Plywood Corp.*, 48 Wn.2d 553; *Jacobson*, 37 Wn.2d 444; *Ray v. Dep't of Labor & Indus.*, 177 Wash. 687, 688, 33 P.2d 375 (1934); *Bryant v. Dep't of Labor & Indus.*, 173 Wash. 240, 22 P.2d 667 (1933); *Cantu v. Dep't of Labor & Indus.*, 168 Wn. App. 14, 277 P.3d 685 (2012). Some of the decisions entailed a worker with a preexisting degenerative spine or arthritis. Ana Zavala cites these cases, but fails to recognize the factual nature of each decision. The trial court could have ruled in favor of Zavala, but we do not agree the trial court necessarily needed to rule for Zavala. Whether a given disability is the result of injury or solely of a preexisting infirmity is normally a question of fact. *Jacobson v. Dep't of Labor & Indus.*, 37 Wn.2d 444, 448, 224 P.2d 338 (1950); *Brittain v. Dep't of Labor & Indus.*, 178 Wash. 499, 504, 35 P.2d 49 (1934); *Ray v. Dep't of Labor & Indus.*, 177 Wash. at 688.

The trial court cited *Austin v. Department of Labor and Industries*, 6 Wn. App. 394, 398, 492 P.2d 1382 (1971) for the proposition that a preexisting condition is not "lit up" if the weight of the evidence reveals: 1) that the condition was symptomatic before the workplace event, or 2) the condition was a naturally progressing condition that would have progressed to symptoms without the injury. Zavala contends the court misapplied

*Austin* because Washington law does not preclude coverage for naturally progressing conditions.

In *Austin*, the workers' compensation claimant appealed a jury verdict affirming the Department of Labor & Industries' closure of his claim and minimal award of a disability. Clinton Austin injured his back while lifting sacks of calcium phosphate at work. Austin's treating physician diagnosed a preexisting rheumatoid arthritis of the spine that the work injury aggravated. On appeal, Austin argued that the condition was latent because he had no back trouble prior to the injury and was able to carry on his work lifting 100-pound bags of calcium phosphate. Following the injury he had not been able to do so. The treating physician first testified that Austin was asymptomatic before the work injury and the injury triggered a sustained exacerbation of the arthritis.

Unlike the evidence in this appeal, Clinton Austin's employer successfully impeached Austin. On cross-examination, Austin admitted to stiffness in his back and muscles and two days' lost work from back aches before the work injury. The employer's manager testified that Austin, before the injury, walked with a stiff gait. In turn, when the employer questioned the treating physician, the physician testified that Austin reported no previous back problems. The physician then admitted that, even without the work injury, Austin's condition, from the rheumatoid arthritis, would have naturally progressed to the condition in which the physician found Austin.

25

Ana Zavala's position in this appeal is more difficult than Clinton Austin's position on appeal. In *Austin*, the trial court refused to give a jury instruction allowing the jury to find that the work injury "lit up" the preexisting condition. In other words, the trial court ruled as a matter of law there was insufficient evidence for a jury to conclude that the employee continued to suffer as a result of the work injury. This court affirmed that there was no evidence for a jury to weigh. Unlike in *Austin*, Zavala's trial court ruled against Zavala on the facts. We do not reweigh the facts.

In *Matson v. Department of Labor and Industries*, 198 Wash. 507, 88 P.2d 825 (1939), the trial court raised the disability rating given by the workers' compensation board. The trial court believed that a work injury contributed to the employee's heart condition. Coworkers testified that before the injury the employee was a good worker, who had never been sick, and who never complained of illness. Despite testimony that the fall at work may have temporarily aggravated the heart condition, the medical testimony established that the employee had a prior heart condition that went unnoticed before the industrial injury. The preexisting condition would have eventually caused the same disability. Therefore, the Supreme Court reversed the jury verdict in favor of the employee.

Even in *Miller v. Department of Labor and Industries*, 200 Wash. 674, 94 P.2d 764 (1939), the seminal case on the "lit up" doctrine, the Supreme Court did not rule in favor of the claimant. The Supreme Court remanded for a determination of what portion

of the disability would have appeared without the work injury and as a result of the preexisting condition.

Given the testimony before it, our trial court correctly relied on *Austin* and properly exercised its fact finding discretion in denying further recovery to Ana Zavala. Whether a condition is naturally progressing informs whether that condition was latent or quiescent before the industrial injury. The testimony of physicians in this case echoed the testimony of the treating physician in *Austin*.

Testimony in this case demonstrated that Ana Zavala's arthritis was naturally progressing. Dr. Bays described her condition as "wear-and-tear arthritis, that has happened over a long period of time." AR at 555. Dr. Iversen testified: "Any persisting problems after [surgery], in my opinion, relate to her preexisting knee osteoarthritis and probably to some unreported prior trauma." AR at 694. Physicians also testified that Ana Zavala must have suffered symptoms before the work injury.

*Challenged Findings of Fact*

We next review Ana Zavala's challenges to the trial court's findings of fact and determine whether substantial evidence supports the respective findings. Zavala challenged finding of fact 2, which describes the work injury:

> On September 17, 2007, while in the course of her employment with Twin City Foods, Inc., Ms. Zavala experienced a sudden and tangible happening when, while cleaning and washing a work area, she struck her left knee. The event produced immediate pain in her left knee. This condition was diagnosed as a *partial tear of the left medial meniscus.*

27

CP at 6 (emphasis added).

Dr. Christopher Kontogianis' testimony supported all propositions within finding of fact 2. Ana Zavala's challenge to this finding may be self-defeating, since the finding recognized a work injury separate from the degenerative change in the knee. Ana Zavala argues the trial court downplayed the work injury and erroneously considered an earlier degenerative condition as the sufficient cause of any continuing pain and treatment. These contentions are best addressed when reviewing other findings of fact.

Finding of fact 2 further read:

> This condition [the work injury] was diagnosed as a partial tear of the left medial meniscus, and was surgically repaired in an arthroscopic procedure on November 21, 2007, by Christopher Kontogianis, M.D.

CP at 6. Ana Zavala argues that the 2007 surgery did not repair her injury, but she may confuse the issue by characterizing all problems with her knee as a single injury without distinguishing between the degeneration and tearing. Zavala's industrial injury was the "partial tear of the left medial meniscus." CP at 6. Dr. Kontogianis, Dr. Bays, and Dr. Gritzka all testified that Kontogianis repaired the tearing in Ana Zavala's left knee via arthroscopic surgery. This testimony is sufficient evidence to persuade a fair-minded, rational person of the soundness of the finding of fact.

Finding of fact 3 describes the preexisting condition in Ana Zavala's left knee:

> Ana Zavala, prior to her industrial injury of September 17, 2007, had extensive preexisting degenerative or arthritic conditions in her left knee

28

described as left knee osteoarthritis and grade 4 chondromalacia of the left femoral condyle.

CP at 6. Ana Zavala challenges finding of fact 3, but adequate evidence supports the finding. All four orthopedists testified that Ana Zavala suffered from preexisting arthritis and chondromalacia. Dr. Kontogianis diagnosed the "significant degenerative change" in Zavala's knee as grade 4 chondromalacia given the near bone-on-bone contact on one side of Zavala's knee joint. AR at 507. Dr. Bays diagnosed the chondromalacia as grade 3 to 4 throughout her knee.

In finding of fact 4, the trial court wrote:

> Ana Zavala's pre-existing left knee osteoarthritis and chondromalacia of the left femoral condyle were not caused by her industrial injury of September 17, 2007, and the industrial injury did not aggravate or accelerate these extensive pre-existing left knee conditions.

CP at 6. Ana Zavala argues that the evidence does not support a finding that her work injury did not aggravate or accelerate her preexisting condition. She goes further and contends that she, in essence, had no preexisting condition, because any arthritis was asymptomatic prior to her industrial injury. She maintains that Twin City Foods offered no direct evidence that her arthritis was symptomatic prior to her industrial injury and, in the absence of such evidence, the trial court needed to accept the testimony of her family and friends that she exhibited no symptoms before her industrial injury.

Some evidence supported Ana Zavala's arguments, but Twin City Foods presented contrary evidence. In turn, substantial evidence supported the trial court's finding that

29

Ana Zavala's arthritis was symptomatic prior to her industrial injury. Dr. Kontogianis opined that Zavala was likely symptomatic before her work injury. Dr. Bays testified that probably less than ten to fifteen percent of patients go from completely asymptomatic to requiring a total knee replacement within two to three years. Dr. Iversen testified that Zavala's arthritis did not worsen between the September 27, 2007 x-ray and September 30, 2008 x-ray. This lack of subsequent degeneration further increases the likelihood that Zavala almost needed a total knee replacement prior to her industrial industry and was likewise symptomatic. When a trial court bases its findings of fact on conflicting evidence and there is substantial evidence to support the findings entered, we do not reweigh the evidence and substitute our judgment even though we might have resolved the factual dispute differently. *Dave Johnson Ins. Inc. v. Wright*, 167 Wn. App. 758, 778, 275 P.3d 339 (2012).

Substantial evidence also supported the trial court's finding that the work injury did not aggravate the preexisting condition of arthritis. Dr. Bays opined that Zavala's industrial injury could not physically aggravate her osteoarthritis, pointing to the difference between inflammatory arthritis and osteoarthritis. Dr. Iversen testified that the arthritis and Zavala's industrial injury were not related based on a lack of bruising. Iversen opined that the industrial injury "caused a temporary *subjective* exacerbation of her preexisting arthritis," but qualified that "there's no objective evidence of acceleration or aggravation of her knee arthritis by this episode." AR at 692-93 (emphasis added).

30

Ana Zavala challenges finding of fact 4 by promoting Dr. Thomas Gritzka's conflicting opinions. But again, this court does not reweigh the evidence. Dr. Kontogianis' testimony harmed Ana Zavala's legal arguments. Kontogianis was Zavala's treating physician and his testimony is entitled to more weight than Dr. Gritzka's opinions. It is settled in this state that, in a worker compensation case, special consideration should be given to the opinion of the attending physician. *Hamilton v. Dep't of Labor & Indus.*, 111 Wn.2d 569, 571, 761 P.2d 618 (1988); *Groff v. Dep't of Labor & Indus.*, 65 Wn.2d 35, 45, 395 P.2d 633 (1964); *Spalding v. Dep't of Labor & Indus.*, 29 Wn.2d 115, 129, 186 P.2d 76 (1947).

Ana Zavala also assigns error to finding of fact 5:

> Ana Zavala's partial tear of the medial meniscus of the left knee was not in need of further proper and necessary medical treatment as of the date of the Department order on appeal, October 20, 2009.

CP at 6. All physicians, except Thomas Gritzka, testified consistently with this finding. Dr. Kontogianis testified that the industrial injury temporarily aggravated the preexisting arthritis, but Zavala became "mostly fixed and stable" as of March 2008. AR at 510. While an earlier MRI showed swelling in Zavala's left knee, Dr. Bays found "no evidence of an effusion or swelling anywhere around the left knee joint" during his April 17, 2009 examination. AR at 547.

Dr. Larry Iversen testified that Zavala's "accepted conditions of torn menisci in her knee would have reached maximum medical improvement within two or three

31

months of her surgery. Any temporary exacerbation of her knee arthritis would have settled down the same length of time." AR at 693-94. Iversen considered Zavala to be at maximum medical improvement as of October 30, 2009. Iversen commented that any persisting problems thereafter related to her preexisting knee osteoarthritis or some unreported prior trauma. Substantial evidence supports the trial court's finding that Zavala needed no further medical treatment as of October 20, 2009.

In finding of fact 6, the court resolved:

> Ana Zavala sustained a permanent partial disability proximately caused by the industrial injury of September 17, 2007, described as 10 percent of the amputation value of the left leg above the knee joint with short thigh stump (3 inches or below the tuberosity of the ischium).

CP at 6. Based on Dr. Thomas Gritzka's testimony, Zavala asks this court to increase her disability rating from 10 to 50 percent. We decline. Dr. Gritzka's rating of 50 percent was based on "bone-on-bone contact in the knee." AR at 632. But Zavala's industrial injury did not cause the bone-on-bone contact. Dr. Kontogianis, Dr. Bays, and Dr. Iversen, each rated Zavala's disability at 10 percent. Sufficient evidence supports the court's finding.

Ana Zavala forwards arguments that attack indirectly all of the trial court's findings of fact. Zavala contends that the trial court employed evidentiary standards that are ambiguous, vague, and contradictory to the point of violating due process, because the court rejected the testimony from her family and friends in favor of testimony from

32

medical experts. Zavala cites no legal authority to support this contention. This court need not address it. RAP 10.3(a)(6); *In re Marriage of Fahey*, 164 Wn. App. 42, 59, 262 P.3d 128 (2011).

Zavala may be frustrated with the trial court's rejection of the testimony of her many lay witnesses. Nevertheless, in an industrial insurance case, credibility determinations are solely for the trier of fact and cannot be overturned on appeal. *Morse v. Antonellis*, 149 Wn.2d 572, 574, 70 P.3d 125 (2003); *Watson v. Dep't of Labor & Indus.*, 133 Wn. App. 903, 909, 138 P.3d 177 (2006). The causal connection between a claimant's physical condition and her employment must be established by medical testimony. *Parr v. Dep't of Labor & Indus.*, 46 Wn.2d 144, 145, 278 P.2d 666 (1955).

Ana Zavala questions why this reviewing court should defer to the trial court's findings with regard to credibility of witnesses, when the trial court read a transcript rather than watched and heard the witnesses. This questioning is legitimate. Nevertheless, under precedent, credibility determinations remain solely for the trier of fact in a workers' compensation claim. *Cantu v. Dep't of Labor & Indus.*, 168 Wn. App. 14, 22, 277 P.3d 685 (2012). The law may assume that the superior court will devote more attention and time to review the transcript than the appellate court and thereby be able to better weigh the believability of a witness' testimony when juxtaposed with other witness testimony. A reviewing court focuses only on those portions of the record highlighted by the parties. A trial court has more experience in evaluating conflicting

33

testimony.

Ana Zavala contends the trial court cannot rely solely on images taken after the industrial injury to support a finding that she was symptomatic before the injury. In support of this assertion, Zavala cites *Harper v. Department of Labor and Industries*, 46 Wn.2d 404, 405-07, 281 P.2d 859 (1955).

In *Harper*, on July 26, 1949, Russell Harper fell eight feet from a truck and landed on his head. An x-ray taken that day disclosed: "a remarkable amount of osteoarthritis of all of the seven vertebrae making up the cervical spine." The court commented: "The present case makes clear that, even though the X ray discloses a marked arthritic condition, it does not, of itself, establish a disabling condition." 46 Wn.2d at 404-05. From this remark, Zavala argues that x-rays of her knee cannot be used to establish a preexisting condition.

We question whether the Supreme Court, in the quote from *Harper*, meant to rule as a matter of law that an x-ray can never verify a disabling preexisting condition. Nevertheless, the decision does not prevent the use of an x-ray to establish a preexisting condition that was not necessarily disabling. We also consider the passage dicta, because the sentence had little relevance to the holding in *Harper*. The board granted Harper a 20 percent partial permanent disability and the trial court increased the award to a 40 percent. The Supreme Court reversed the trial court and reinstated the board's award because evidence supported the board's decision.

In *Tomlinson v. Puget Sound Freight Lines, Inc.*, 166 Wn.2d 105, 117, 206 P.3d

657 (2009), our Supreme Court discussed the use of x-rays to show a preexisting

condition. The court agreed that x-rays alone could not establish a disabling condition

present before the work injury. Nevertheless, physician testimony and a claimant's lack

of candor, combined with x-rays, may bring the necessary proof. The court wrote:

> Tomlinson's principle argument is that x-ray findings, while objective in that they can be seen, are not, solely by themselves, proof of a loss of physical function. *Cf. In re Johnston*, No. 97 4529, 1999 WL 190864 (Wash. Bd. of Indus. Ins. Appeals Mar. 2, 1999). We emphatically agree that x-ray findings alone would be insufficient, but that is not the case before us. The industrial insurance judge concluded that all three physicians who testified, including his treating doctor, agreed that at the time of the industrial injury, Tomlinson's preexisting condition was bone on bone in his weight bearing knee joint. He also found that all three physicians agreed that he had a preexisting 50 percent [permanent partial disability] PPD. In addition, the industrial appeals judge heard Tomlinson's own testimony, which the judge found evasive. He showed "lack of candor" about his past medical treatment and did not remember injuring his knee and discussing the possible need for a bilateral total knee replacement seven years before his industrial injury. . . . In short, Tomlinson's own testimony supported the conclusion that he had loss of function before his 1999 industrial injury. We find there was substantial evidence to support the finding of a preexisting PPD.

166 Wn.2d 105, 118-19, 206 P.3d 657 (2009).

Ana Zavala's appeal is like *Tomlinson*. Zavala's medical records included a

September 27, 2007 x-ray, September 30, 2008 x-ray, and October 3, 2007 MRI. Like

*Tomlinson*, all examining doctors concluded, based in part on the images, that Zavala had

preexisting degeneration in her knee. Other evidence supported that Zavala was not an

accurate historian. Dr. Bays testified that Zavala's reported symptoms did not match her physical conditions. Dr. Iversen believed that Zavala failed to report a previous injury, reasoning that the September 17, 2007 bump to her knee could not have caused the severity of tearing observed.

## Conclusions of Law

Ana Zavala challenges the trial court's conclusions of law. Our role is to determine whether the findings of fact support the trial court's conclusions of law. *Tomlinson v. Puget Sound Freight Lines, Inc.*, 166 Wn.2d 105, 109, 206 P.3d 657 (2009); *Eastwood v. Dep't of Labor & Indus.*, 152 Wn. App. 652, 657, 219 P.3d 711 (2009).

In conclusion of law 2, the trial court ruled that Ana Zavala's work injury did not demand "further proper and necessary medical treatment within the meaning of RCW 51.36.10." CP at 7; Under former RCW 51.36.010 (2007):

> Upon the occurrence of any injury to a worker entitled to compensation under the provisions of this title, he or she shall receive *proper and necessary* medical and surgical services at the hands of a physician or licensed advanced registered nurse practitioner of his or her own choice, if conveniently located, except as provided in (b) of this subsection, and *proper and necessary* hospital care and services during the period of his or her disability from such injury.

(Emphasis added) (now codified at RCW 51.36.010(2)(a)). The Department of Labor and Industries defined "proper and necessary" in WAC 296-20-01002. Subsection (3) of the regulation describes when the department, or a self-insured employer, may stop paying for medical services:

The department or self-insurer stops payment for health care services once a worker reaches a state of maximum medical improvement. Maximum medical improvement occurs when *no fundamental or marked change in an accepted condition can be expected, with or without treatment.* Maximum medical improvement may be present though there may be fluctuations in levels of pain and function. A worker's condition may have reached maximum medical improvement though it might be expected to improve or deteriorate with the passage of time. Once a worker's condition has reached maximum medical improvement, treatment that results only in temporary or transient changes is not proper and necessary. "Maximum medical improvement" is equivalent to "fixed and stable."

WAC 296-20-01002(3) (emphasis added). The definition for maximum medical improvement in WAC 296-20-01002 "applies to arthritis." *Tomlinson*, 166 Wn.2d at 113.

Substantial evidence supported the trial court's findings that (1) the arthroscopy repaired Ana Zavala's industrial injury, (2) her industrial injury did not aggravate or accelerate her preexisting arthritis, and (3) the industrial injury had stabilized, requiring no further care, as of October 20, 2009. In turn, these findings of fact supported the trial court's conclusion that Zavala needed no further treatment as a result of the industrial jury.

Ana Zavala, seeks at Twin City Foods' expense, a total knee replacement. The same findings of fact and conclusions of law support the trial court's ruling that a knee replacement is not needed because of the work injury.

Ana Zavala challenges conclusion of law 3, by which the trial court ruled that

Zavala's permanent partial disability was ten percent. The compensation afforded an injured worker under Title 51 RCW includes a singular payment for a permanent partial disability, according to the schedule in RCW 51.32.080. The administrative code clarifies a permanent partial disability:

> Permanent partial disability is any anatomic or functional abnormality or loss after maximum medical improvement (MMI) has been achieved. At MMI, the worker's condition is determined to be stable or nonprogressive at the time the evaluation is made. A permanent partial disability award is a monetary award designed to compensate the worker for the amputation or loss of function of a body part or organ system. Impairment is evaluated without reference to the nature of the injury or the treatment given. To ensure uniformity, consistency and fairness in rating permanent partial disability, it is essential that injured workers with comparable anatomic abnormalities and functional loss receive comparable disability awards. As such, the amount of the permanent partial disability award is not dependent upon or influenced by the economic impact of the occupational injury or disease on an individual worker. Rather, Washington's Industrial Insurance Act requires that permanent partial disability be established primarily by objective physical or clinical findings establishing a loss of function.

WAC 296-20-19000.

We previously upheld the trial court's finding of fact 6, which determined that Ana Zavala sustained a permanent partial disability proximately caused by the industrial injury of 10 percent of the amputation value of the left leg above the knee joint. This finding of fact directly confirms conclusion of law 3.

By conclusion of law 4, the trial court remanded the case to the Department of Labor & Industries with directions to issue an order in which it denies responsibility for

the conditions described as left knee osteoarthritis and grade 4 chondromalacia of the left femoral condyle and to close the claim. This conclusion of law necessarily followed from the other findings of fact and conclusions of law entered by the trial court.

*Attorney Fees*

Ana Zavala requests costs and fees under RCW 51.52.130. Zavala did not brief her request for costs and fees in her brief. The court rule requires more than a bald request for attorney expenses on appeal. The party seeking costs and attorney fees must provide argument and citation to authority to establish that such expenses are warranted. *Henne v. City of Yakima*, 177 Wn. App. 583, 590, 313 P.3d 1188 (2013), *reversed on other grounds by*, No. 89674-7 (Wash. Jan. 22, 2015); RAP 18.1. Therefore, we deny an award of fees and costs.

CONCLUSION

We affirm the trial court's rulings and deny Ana Zavala an award of reasonable attorney fees and costs.

_____
Fearing, J.

WE CONCUR:

_____
Korsmo, J.

_____
Lawrence-Berrey, J.

39