FILED
COURT OF APPEALS DIV I
STATE OF WASHINGTON

2019 FEB -5 PM 12: 11

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| MASCO CORP., | No. 77478-6-I |
| Appellant, | DIVISION ONE |
| v. | UNPUBLISHED OPINION |
| CARLOS ANGULO, | |
| Respondent. | FILED: February 5, 2019 |

CHUN, J. — Carlos Angulo worked as an insulation installer for Masco Corporation (Masco) for nearly two decades. He developed degenerative disc disease of the cervical spine and filed an occupational disease workers' compensation claim with the Department of Labor & Industries (the Department). The Department allowed the claim, and Masco protested the decision. An Industrial Appeals Judge (IAJ) reversed the Department's decision. The Board of Industrial Insurance Appeals (the Board) reversed the IAJ's decision and reinstated the claim. Masco appealed, and the superior court conducted a bench trial. The trial court affirmed the decision of the Board allowing the claim for an occupational disease. We affirm.

I.
BACKGROUND

Masco is a self-insured employer. Angulo worked for Masco for 19 years, installing insulation in both residential and commercial buildings. In January 2013, Angulo had a workplace accident and sustained a major lower back injury.

As a result of this injury, Dr. Sanford Wright performed lumbar surgery on Angulo's back in May 2013.[1] Shortly before this surgery, Angulo reported pain in his neck, right shoulder, and right arm down to his little finger.

Due to this neck and shoulder pain, Angulo filed a workers' compensation occupational disease claim alleging injury as of January 2013. This occupational disease claim did not relate to the prior lower back injury and surgery. The Department allowed the claim on December 9, 2014 and affirmed that decision on January 15, 2015.

Hearing Before the IAJ. Masco subsequently appealed to the Board. An IAJ conducted a live hearing on November 16, 2015, with testimony from Angulo through a Spanish interpreter.

Angulo testified that he was 54 years old and had received formal education through only fourth grade in Mexico. He spoke very little English and typically needed an interpreter for medical appointments.

Angulo began working for Masco as an insulation installer in 1994, and worked full-time at this job for about 19 years. Masco paid for installation as piecework, so Angulo worked as quickly as possible and the job was very fast paced.

Angulo described a typical day of his work. Each day began by packing his truck with an average of 16 large packages of insulation weighing approximately 70 or 80 pounds each. After he lifted the packages of insulation

---

[1] Angulo filed a workers' compensation claim that the Department accepted. That claim is not at issue in the current case.

2

into the truck, Angulo drove to the work site and unloaded the packages and heavy scaffolding into the building.

Once he had set up his job site, Angulo would put on his equipment, including a pouch (containing his stapler, hammer, and knife) and stilts. He often spent four or five hours on stilts to install insulation in ceilings, high walls, and around ventilation systems. Sometimes Angulo needed to go down into crawl spaces to work.

To perform his job, Angulo had to look up constantly with his neck bent backward. He also had to raise his arms over his shoulders to work. He spent hours each day in this position. He testified that by the end of the day his neck "was just done."

Angulo described his neck pain. He experienced stabbing pain in his shoulders and pressure in his neck. He described his pain as moderate on good days, but on bad days, he could not move his neck. The pain started in his neck and shoulders and traveled up to his head. He also experienced numbness on the side of his face and very frequent numbness and tingling in his arms. The numbness and tingling went around the circumference of the arm and affected his fingers.

Angulo could not recall exactly when the neck and shoulder pain began, but he estimated the symptoms started after about six years of installing insulation. He said the pain and discomfort progressed and worsened over time. The pain became more intense and limited his ability to work. Angulo testified he did not pay attention to the pain at the beginning, but as the pain worsened he

noticed he needed to take more small breaks and bring his arms down to reduce the pain. In addition, insulating parking garages took a heavy toll on his neck, and he stopped working those jobs during his last five years of employment with Masco.

Angulo said that, despite the worsening pain, he never alerted his supervisors at work because he needed the money from his job. Angulo said he worried Masco would send him to a doctor who would say he could no longer work. Angulo said, "My bills were not going to wait for me to get back to work, so no, I simply could not do that. It was much too much to miss even one day, just too much."

In addition to Angulo's testimony, the IAJ received medical evidence through perpetuation depositions, summarized here:

Michael Santoro, M.D. Occupational medicine physician Dr. Michael Santoro served as Angulo's attending physician for his cervical spine disease. Dr. Santoro began treating Angulo in January 2015. At the time of referral, Dr. Santoro noted Angulo had neck pain radiating into both arms. Angulo experienced tightness of the right side of the neck with numbness traveling into his arms, especially on the right side. Upon initial examination in January 2015, Dr. Santoro found limited neck mobility, especially with respect to extending the neck or bending it backwards. Angulo also had significantly limited range when turning or rotating the neck and bending it toward the side. When Dr. Santoro

4

performed the Spurling's maneuver,[2] Angulo experienced pain in his neck but not radiating into his arms. Angulo had tenderness in the muscles throughout his neck, trapezius muscle, and sternomastoid muscle. His neck appeared straighter, without the normal, gentle forward curve.

According to Dr. Santoro, Angulo's neurological examination revealed normal strength and sensation to both arms except "[h]e was able to feel pinprick in his left hand and had generally diminished sensation, but nothing that I could find that was in what is called a dermatomal pattern that correlated to a specific nerve." Angulo had absent reflexes at the brachioradialis on both right and left, indicating a potential impairment of the nerve at cervical spine level C6 or C7.

Dr. Santoro described the results of the MRI of Angulo's neck from December 2013:

> An MRI was performed of his neck in December of 2013 that showed multilevel spondylosis, which is wear, bone spurs and crowding of the spine. That was at the lower levels, mainly on the right side, with narrowing of the exit points, where the nerves exit the spinal cord traveling into the arms. There was likely pinching of the nerves as they were trying to exit the spinal cord, although the spinal cord itself was not being compressed by these changes in his neck.

Dr. Santoro noted a wear-type pattern involving bone spurs and crowding of the nerves in various areas, but most significantly at C5-6 and C6-7. Dr. Santoro described further features of the MRI, including reactive endplate edema between the sixth and seventh vertebrae indicating acute and chronic inflammation where the discs and vertebrae come into contact. The MRI showed

---

[2] This involves extending the neck as best as possible and then turning it to the side and applying gentle compression.

evidence of narrowing of the foramen,[3] which likely resulted in impingement on the nerves.

Based on his examination and the MRI, Dr. Santoro diagnosed neck strain with degeneration of cervical discs and cervical spine stenosis. Dr. Santoro opined that work activities either caused or permanently aggravated Angulo's cervical condition. He further explained this conclusion as follows:

[I]n all of us, as we get older, there are some of these degenerative problems that appear in the cervical spine, but the degree of changes that were seen on the MRI scan, I believed, were more advanced than what I would expect to see in someone who was 53 years old at the time that I saw Mr. Angulo, and that the nature of his work, in performing sustained overhead work with his neck extended, was a significant factor and contributing to the development of this problem.

According to Dr. Santoro, Angulo's job involving heavy lifting and working with his neck bent backwards put significant strain on the small joints in the back of the neck, which "are not really meant to be loaded." The weight of overhead lifting combined with extending the neck is "not a good combination." Dr. Santoro concluded that Angulo's work activities as an insulation installer, on a more probable than not basis, gave rise to and proximately caused the cervical spine condition.

Dr. Santoro testified that the American Medical Association Guides to the Evaluation of Disease and Injury Causation (AMA Guides)[4] did not address the development of cervical spine disease in the context of insulation installation or

---

[3] The foramen are the small openings in the bony areas of the spine that allow the nerves to exit from the spinal cord and travel toward the arms.

[4] The AMA Guides compiles information about diagnoses and causation to assist in scientifically determining causation. https://commerce.ama-assn.org/store/catalog/productDetail.jsp?product_id=prod1290007&navAction=push

any studies pertaining to neck extension for prolonged periods of time or overhead work. But the AMA Guides did mention repeated overhead lifting as a risk factor for developing neck pain. Furthermore, Dr. Santoro noted the AMA Guides is not an exhaustive compilation of studies and research on causation.

Sanford Wright, M.D. Dr. Wright began treating Angulo for his cervical spine condition in November 2013. Upon examination, Dr. Wright noted tenderness at the back of the neck, limited range of motion in the neck, and decreased sensation in both arms. Dr. Wright ordered the December 2013 MRI that revealed narrowing of the nerve openings at the C5-6 and C6-7 disc levels due to degenerative changes. Dr. Wright characterized the foraminal narrowing as moderately severe and "significant."

At subsequent appointments, Dr. Wright diagnosed symptomatic spinal cord and nerve pinching and compression. As of March 2014, Dr. Wright recommended surgery; specifically, a bilateral C5-6 and C6-7 laminectomy to enlarge the narrowed nerve openings to reduce the pain, numbness, and weakness.

In his deposition, Dr. Wright noted the connection between Angulo's neck issues and his employment:

> After 18 years of work, the pain became so great, he could no longer do overhead work, or any work for that matter. This due to his neck, shoulder and upper extremity pain on both sides.
>
> His activity, his work activity, aggravated the degenerative changes in the spine that in turn caused stenosis or narrowing of the nerve openings or foramina, which in turn brought about significant nerve root compression and pain, nerve pinching. Surgery was needed to free up the nerves at those sites.

Dr. Wright opined that on a more probable than not basis, Angulo's cervical spine disease arose naturally and proximately from the distinctive conditions of his employment as an insulation installer. While Dr. Wright could not give any evidence-based, science-driven support for this conclusion, he relied on his 36 years of clinical experience.

John Robertson, M.D. Sports medicine physician Dr. Robertson treated Angulo for his cervical spine condition from June to September 2014, when he was no longer on the list of physicians authorized to treat Department patients. He opined on a more probable than not basis that Angulo's cervical spine degeneration was related to his employment as an insulation installer. He testified that looking up tends to pinch the facet joints, accelerating the normal degenerative process. He believed that if repetitive neck extension was not the cause, it certainly contributed to degeneration of the cervical spine.

Roman Kutsy, M.D. Masco hired neurologist Dr. Roman Kutsy to review medical records and conduct an independent medical examination of Angulo. Dr. Kutsy conducted this examination in September 2015.

Dr. Kutsy stated that, as best he could determine, Angulo experienced neck pain on and off for about ten years, flaring up significantly after the back operation. Dr. Kutsy described Angulo's pain as located in the back of the neck and spreading to the shoulders. Angulo experienced the pain on both sides, initially more severe on the left but then it became more severe on the right side. Angulo had headaches starting in the upper part of his neck as pressure, unrelieved by anti-inflammatory medication. Dr. Kutsy explained that Angulo

8

described feeling numbness in the neck, spreading to both shoulders, down the length of the arms, and into his fingers. Dr. Kutsy opined that numbness was an unusual complaint for someone with cervical spine problems.

Dr. Kutsy reviewed the December 2013 MRI and noted Angulo's symptoms did not correspond to his expectations based on the MRI. In particular, he believed the pattern of numbness in the neck, arms, and fingers did not correlate with the objective findings of the MRI. Dr. Kutsy disagreed with the radiologist's finding of severe disease, describing the level of cervical spine degeneration as "modest."

Dr. Kutsy testified he had a difficult time examining Angulo because of significant "self-preservation behavior."[5] He found "give-way weakness" related to poor effort, but Dr. Kutsy could not determine whether the poor effort stemmed from pain or volition. Angulo's range of motion in his neck was significantly and unexpectedly limited for a person without extensive neck fusion. Angulo demonstrated an "out-of-proportion response" to touch in his neck and shoulders. Dr. Kutsy also found the sensory examination surprising, with decreased sensation in unexpected areas for someone with neck pain.

Dr. Kutsy found no signs that Angulo suffered from a pinched nerve, because Angulo did not present with abnormal motor findings, changes in strength, muscle atrophy, changes in reflexes, or sensation following the nerve roots. He did not believe Angulo had an impairment or condition relating to his

_____

[5] Dr. Kutsy identified similar guarding behavior in notes from other physicians. A December 2013 report from Dr. Seib notes diffuse tingling and pain that does not follow any distribution of spinal roots. In October 2014, Dr. Alma Garcia wrote, "Difficult to ascertain weakness due to claimant's effort."

9

cervical spine. The history of normal neck examinations led Dr. Kutsy to conclude, "there were no cervical issues, period, which . . . confirms an opinion that his MRI is probably irrelevant and just shows something which is very, very common."

According to Dr. Kutsy, the condition affects most people in Angulo's age group and progresses naturally, independent of employment. He explained that based on the AMA Guides, occupational exposure did not create recognizable risk factors for cervical spine disease. Dr. Kutsy testified that flexion and overhead work do not contribute to cervical spine disease, and lifting 50 kilograms of weight had a weak association with cervical spine symptoms. Dr. Kutsy concluded Angulo's cervical spine condition on a more probable than not basis did not arise as a proximate condition of his employment. He opined Angulo had a pre-existing degenerative condition of the cervical spine that was not aggravated by employment.

S. Daniel Seltzer, M.D. Dr. Seltzer, an orthopedic surgeon, reviewed Angulo's medical records. Masco hired him to conduct an independent physical examination, but due to scheduling confusion, Dr. Seltzer did not personally examine Angulo. Based on the December 2013 MRI, Dr. Seltzer opined Angulo had multilevel degenerative changes in most of the disc spaces in his neck with most severe involvement at C5-6 and C6-7. Angulo had mild to moderate foraminal stenosis.

In reviewing the records, Dr. Seltzer found Angulo's first mention of neck symptoms in April 2013. At that point, Angulo had not worked as an insulation

10

installer since January 2013 due to his lower back injury. Based on the fact that Angulo had not been working at the time he began reporting the neck pain, Dr. Seltzer stated, "I would find that to be unusual and an indicator that it is unlikely that the symptoms would relate to Mr. Angulo's employment."

Dr. Seltzer further opined that the imaging showed findings typical of people in Angulo's age range, associated with aging rather than work activities. He diverged from the radiologist's interpretation and graded the foraminal narrowing as mild to moderate, rather than severe. He noted that any nerve impingement would be moderate rather than severe.

Dr. Seltzer stated heavy work in and of itself is not a recognized cause of cervical degeneration in peer-reviewed literature. Dr. Seltzer testified that there are no physical risk factors that could cause or accelerate degenerative conditions in the neck, but there are activities that might exacerbate or make an individual aware of a condition.

The IAJ's Decision. The IAJ reversed and remanded the Department's order allowing the claim, concluding Angulo's cervical disc degeneration was not an occupational disease as it did not arise naturally and proximately out of the distinctive conditions of his employment. In arriving at that determination, the IAJ relied on Dr. Seltzer's and Dr. Kutsy's descriptions of Angulo's MRI results as typical for a person his age. He also cited Dr. Kutsy's testimony concerning Angulo's pain response and inconsistent findings during the physical exam. The IAJ discounted Angulo's treating physicians, saying they based their opinions on inaccurate information about his work history. Finally, the IAJ found

11

unpersuasive Angulo's reasons for delaying any report of his neck pain. The IAJ remanded the claim to the Department to issue an order rejecting the claim.

The Board's Decision. Angulo requested review of this decision, and the Board subsequently issued a decision (2-1) and order reversing the IAJ and affirming the Department's decision to allow the claim. The Board found the distinctive conditions of Angulo's employment required him to look up with his neck bent backward for hours at a time and to lift up to ten pounds above his shoulder on a frequent basis. The Board further attributed Angulo's cervical disc disease as arising naturally and proximately out of these conditions. The Board concluded Angulo's cervical disc disease was an occupational disease and affirmed his claim. Masco appealed this decision to the superior court.

The Superior Court's Decision. The superior court heard oral argument at a bench trial in August 2017 and issued a written decision on September 19, 2017. The trial court found Angulo's cervical disc degeneration to be an occupational disease and affirmed the decision of the Board and the Department. Masco appeals.

## II.
## ANALYSIS

A. Occupational Disease

Masco claims the trial court erred by affirming the Board's decision finding Angulo's cervical spine degenerative disc condition an occupational disease under RCW 51.08.140. Specifically, Masco argues that substantial evidence does not support the trial court's findings of fact and that the conclusions of law

do not flow from those findings. However, the trial court concluded Angulo suffered from an occupational disease based on its evaluation of the credibility of various medical evidence. Because the appellate court does not revisit issues of credibility, we affirm.

Under the Industrial Insurance Act, "a worker injured in the course of employment suffers from an 'occupational disease' and is entitled to certain benefits." Gorre v. City of Tacoma, 184 Wn.2d 30, 33, 357 P.3d 625 (2015). The Act defines an occupational disease as "such disease or infection as arises naturally and proximately out of employment . . ." RCW 51.08.140. The burden of proving an injury arose naturally and proximately from employment falls on the worker. Gorre, 184 Wn.2d at 33.

To establish that an occupational disease "arises proximately," employment conditions must be the proximate cause of the disease such that the disease would not have been contracted but for the employment conditions. Street v. Weyerhaeuser Co., 189 Wn.2d 187, 194, 399 P.3d 1156 (2017). Competent medical testimony must establish the causal connection such that claimant's employment probably, not merely possibly, caused the condition. City of Bellevue v. Raum, 171 Wn. App. 124, 140, 286 P.3d 695 (2012). The trier of fact should give special consideration to the opinion of the attending physician. Chalmers v. Dep't of Labor & Indus., 72 Wn.2d 595, 599, 434 P.2d 720 (1967); Hamilton v. Dep't of Labor & Indus., 111 Wn.2d 569, 571, 761 P.2d 618 (1988).

"To satisfy the 'arises naturally' requirement, a worker must prove the occupational disease came about as a natural consequence of distinctive

employment conditions." Street, 189 Wn.2d at 195. This proof of simple causation does not require expert opinion. Street, 189 Wn.2d at 195.

A modified standard of review applies in industrial insurance appeals. Gorre, 184 Wn.2d at 36. The superior court reviews decisions de novo, relying on the certified Board record. Raum, 171 Wn. App. at 139. The Board's order is presumed correct and the party challenging the Board's decision carries the burden on appeal. Gorre, 184 Wn.2d at 36; RCW 51.52.115. "The superior court can make its own findings or reach a different result only if the judge finds by a preponderance of the evidence that the Board's findings and decision are erroneous." Gorre, 184 Wn.2d at 36.

On appeal of an industrial insurance claim from the superior court, the appellate court reviews the record to determine "whether substantial evidence supports the findings made after the superior court's de novo review and whether the conclusions of law flow from the findings." Gorre, 184 Wn.2d at 36. The appellate court does not examine issues of credibility as "credibility determinations remain solely for the trier of fact in a workers' compensation claim." Zavala v. Twin City Foods, 185 Wn. App. 838, 869, 343 P.3d 761 (2015)

Dr. Kutsy testified that the AMA Guides did not recognize repetitive looking up and overhead work as a cause of cervical degenerative changes. The trial court found this testimony lacking in accuracy and credibility. Instead, the trial court relied on Dr. Santoro's discussion of a quote in the AMA Guides "about performing repeated . . . overhead lifting as a risk factor for developing neck pain," as well as Dr. Santoro's statement that the AMA Guides summarizes

14

scientific studies but is not exhaustive. The trial court evaluated the conflicting testimony and made a credibility determination in favor of Dr. Santoro.

Similarly, the trial court found Dr. Santoro's testimony credible on the MRI findings. Masco argues the court erred by discounting Dr. Seltzer's testimony that Angulo's MRI results showed only mild cervical degeneration consistent with normal aging and relying on Dr. Santoro's statements to the contrary. The trial court found Dr. Seltzer's testimony in conflict with Dr. Santoro's testimony, requiring a credibility determination. After weighing the testimony, the trial court concluded the medical evidence supported Dr. Santoro's testimony and found Dr. Seltzer's process and conclusions lacked credibility.

Finally, Masco also claims the trial court erred in finding Angulo credible despite his contradictory statements and lengthy delay in reporting his cervical spine symptoms. The trial court concluded Angulo's delayed report of back pain resulted from human frailty rather than deception and Angulo's loss of reflexes proved credibility.

Each of Masco's contentions that substantial evidence does not support the trial court's findings of fact relates to credibility determinations. But a credibility determination is not subject to review on appeal. State v. Mines, 163 Wn.2d 387, 391, 179 P.3d 835 (2008). We will not revisit these issues.[6]

---

[6] The Zavala court addressed this deference in workers' compensation cases where the trial court reads transcripts rather than hears testimony from live witnesses:

> Ana Zavala questions why this reviewing court should defer to the trial court's findings with regard to credibility of witnesses when the trial court read a transcript rather than watched and heard the witnesses. This questioning is legitimate. Nevertheless, under precedent, credibility determinations remain solely for the trier of fact in a workers' compensation claim. Cantu v. Dep't of Labor & Indus., 168 Wash. App. 14[, 22, 277 P.3d 685] (2012). The law may assume that the superior

As a result of the credibility determinations, the evidence supports the trial court's statement that "[a] 'severe' finding would not be consistent with normal aging." The conclusion that Angulo suffers from an occupational disease flows logically from the severe cervical spine degeneration inconsistent with normal aging and the additional credible medical testimony on causation. Therefore, substantial evidence supports the trial court's decision.

B. Evidence Outside the Record

Masco contends the trial court committed prejudicial error by considering evidence outside the Board's hearing record during oral arguments. Specifically, Masco takes exception to the trial court's examination of the MRI report and medical chart entries, as well as consideration of its own thoughts on Angulo's language barrier, the process of spine degeneration, and the size and weight of insulation. Because the trial court's written decision does not rely on evidence improperly considered, we disagree that the court committed prejudicial error.

The Industrial Insurance Act provides that the trial court "shall not receive evidence or testimony other than, or in addition to, that evidence offered before the Board . . ." RCW 51.52.115. Therefore, the superior court reviews the Board's decision based solely on the evidence and testimony presented to the Board. Stelter v. Dept. of Labor & Indus., 147 Wn.2d 702, 707, 57 P.3d 248 (2002). The appellate court presumes the trial court disregarded improper

court will devote more attention and time to review the transcript than the appellate court and thereby be able to better weigh the believability of a witness' testimony when juxtaposed with other witness testimony. A reviewing court focuses only on those portions of the record highlighted by the parties. A trial court has more experience in evaluating conflicting testimony.

Zavala, 185 Wn. App. at 869-70.

evidence when making its findings. Katare v. Katare, 175 Wn.2d 23, 40 n.8, 283 P.3d 546 (2012); State v. Miles, 77 Wn.2d 593, 601, 464 P.2d 723 (1970). "In nonjury proceedings a new trial ordinarily will not be granted for error in the admission of evidence, if there remains substantial admissible evidence to otherwise support the trial court's findings." Miles, 77 Wn.2d at 601.

During the bench trial, the court discussed the 2013 MRI report that had not been before the Board. In the written decision, the trial court referenced the radiologist's interpretation of the MRI as showing "severe foraminal narrowing." Multiple medical experts testified as to this specific finding in the MRI report.[7] Given the testimony by the medical professionals as to the details of the MRI, the trial court's examination of the actual report was inconsequential.

Furthermore, the decision of the Board before the court for review specifically described the MRI report as showing "severe foraminal narrowing on the right at C5-6 and bilaterally at C6-7." Therefore, the reference to "severe foraminal narrowing" in the trial court's written decision had a clear foundation in the record beyond the actual MRI report. The court's written decision provides no evidence of impermissible consideration of the MRI report.

Masco also disputes the trial court's discussion of a chart note from Dr. Wright about the onset of the neck pain during oral arguments. But the trial court's written decision does not mention Dr. Wright's chart note or attempt to pinpoint the exact onset and reporting of neck pain in support of Angulo's

---

[7] CP 286, 322-23 (Dr. Kutsy), 437, 443-44 (Dr. Robertson), 484-85 (Dr. Santoro), 575-76 (Dr. Wright).

credibility. Thus, the written decision fails to show the trial court impermissibly relied on this evidence.

Similarly, Masco challenges the trial court's discussion about Angulo's access to interpreters, the process of spine degeneration, and personal knowledge of the heft of insulation. The trial court raised these issues while questioning Masco's counsel during oral arguments. However, the written decision does not reference these issues or show the trial court considered them when reaching its conclusions. Masco does not overcome the presumption that the trial court disregarded improper evidence.

Furthermore, trial judges are not barred from using personal knowledge and common sense in arriving at a decision. "We do not believe the legislature intended that judges leave their knowledge and understanding of the world behind and enter the courtroom with blank minds. Judges are not expected to leave their common sense behind." State v. Grayson, 154 Wn.2d 333, 339, 111 P.3d 1183 (2005). Therefore, we find no merit in Masco's claim that the court committed prejudicial error by considering evidence outside the record.

C. Due Process

Masco requests a new trial because the trial court violated due process and denied a fair trial. According to Masco, the trial court was not adequately familiar with the evidence in the record after reading the record at "warp speed," focusing on the briefing, and only "spot-checking" a few things. The judge also called Masco's argument on causation related to age and smoking as "specious." Based on this, Masco claims the trial judge predetermined his position, failed to

18

properly review the evidence, and denied Masco a fair trial. We disagree.

Basic due process requires a fair trial in a fair tribunal. Withrow v. Larkin, 421 U.S. 35, 46, 95 S. Ct. 1456, 43 L. Ed.2d 712 (1975). A biased decision-maker is constitutionally unacceptable. Withrow, 421 U.S. at 46. But "[w]e presume that courts are fair and will properly 'discharge [ ] [their] official duties without bias or prejudice.' This presumption is inherent in the role of a judge." In re Disciplinary Proceeding Against King, 168 Wn.2d 888, 904, 232 P.3d 1095 (2010) (citations omitted). Therefore, "[a]n assertion of an unconstitutional risk of bias must overcome a presumption of honesty and integrity accruing to judges." State v. Chamberlin, 161 Wn.2d 30, 38, 162 P.3d 389 (2007). Overcoming the presumption requires specific facts establishing bias. In re Pers. Restraint of Davis, 152 Wn.2d 647, 692, 101 P.3d 1 (2004).

Masco fails to provide sufficient proof to overcome this presumption. The trial court explained its preparation, including review of the briefs and decisions of the Board and the ALJ, and reference to the record as needed. The trial court heard oral argument from the parties and took the case under advisement before issuing its written decision. The record demonstrates thorough consideration of the parties' positions.

While the trial court showed clear reservations about Masco's position, it provided Masco the opportunity to argue in response and attempt to alleviate the reservations. Understandably, Masco may not have appreciated the trial court's overt skepticism or pointed questions about its theory of the case. But, the trial court's aggressive inquiry does not amount to specific evidence of bias.

19

D. Attorney Fees on Appeal

Angulo requests fees on appeal under RCW 51.52.130, which awards fees to a worker whose right to relief is sustained when the employer appeals. Young v. Dept. of Labor & Indus., 81 Wn. App. 123, 132, 913 P.2d 402 (1996). "[T]he statute encompasses fees in the superior court and the appellate court when both courts review the matter." Fred Meyer, Inc. v. Shearer, 102 Wn. App. 336, 341, 8 P.3d 310 (2000). Here, Masco appealed the decision of the Board. Angulo defended the appeal and the prevailed on his right to relief. Therefore, we award reasonable attorney fees as requested.

Affirmed.

Chun, J.

WE CONCUR: