# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| CLARK COUNTY; DEPARTMENT OF LABOR AND INDUSTRIES, | No. 51170-3-II |
| Respondents and Cross-Appellants, | |
| v. | |
| JENNIFER MAPHET, | UNPUBLISHED OPINION |
| Appellant and Cross-Respondent. | |

CRUSER, J. — Jennifer Maphet injured her right knee while at work. Her employer, Clark County, is a self-insured employer. Maphet underwent nine surgeries on her knee. The County contested its responsibility for the ninth surgery to the Department of Labor and Industries (L&I). L&I issued an order for the County to authorize and pay for the surgery. The County appealed. The Board of Industrial Insurance Appeals (BIIA) affirmed L&I's order. The County appealed to the trial court, and the jury returned a verdict that the industrial injury did not cause the need for the ninth surgery and that the ninth surgery was not proper and necessary.

Maphet appeals, and the County and L&I cross appeal. Both Maphet and L&I argue that the trial court erred in denying their CR 50 motions because the County accepted the knee condition when it authorized the other surgeries and the compensable consequences doctrine requires the County to cover the residuals of its authorized surgery. They further argue that the County conceded the issue that the ninth surgery was proper and necessary. The County argues in

its cross appeal that the trial court erred when it found that evidence of authorization is not excluded under ER 409.

We hold that the trial court did not err in allowing evidence of authorization. We also hold that the trial court erred in denying Maphet's and L&I's CR 50 motions as a matter of law because the County accepted the knee condition, which the ninth surgery was performed to correct, when it authorized the sixth, seventh, and eighth surgeries; the compensable consequences apply; and the County conceded the issue of whether the surgery was proper and necessary. Accordingly, we reverse.

## FACTS

### I. BACKGROUND

Maphet was a correctional officer at Clark County Jail. On November 8, 2009, while at work, she slipped on a piece of paper and fell down a flight of stairs. She injured her right knee.

Her self-insured employer, the County, authorized eight surgeries on Maphet's knee. Her first four surgeries included surgeries on her meniscus, her medial femoral condyle, and her patella. During her fifth surgery on January 24, 2013, Dr. Jonathan Greenleaf testified that he noticed that her kneecap had been pulled to the outside of her knee and he chose to perform a lateral retinacular release, which released part of the ligaments holding Maphet's kneecap in place. As a result, Maphet developed patellofemoral instability. Dr. Greenleaf performed surgeries in May 2013 (sixth surgery), December 2013 (seventh surgery), and August 2014 (eighth surgery) to correct the patellofemoral instability. He then performed a ninth surgery on March 20, 2015, also to treat the patellofemoral instability. This is the surgery at issue. The County refused to authorize the ninth surgery and contested its responsibility for this surgery to the L&I.

The L&I issued an order directing the County to authorize and pay for the ninth surgery and to accept responsibility for a concussion from when Maphet fell from the knee instability.[1] The County appealed this order to the BIIA, arguing that the industrial injury did not proximately cause the ninth surgery and that the ninth surgery was not proper and necessary.

## II. BOARD OF INDUSTRIAL INSURANCE APPEALS

The following testimonies were presented to the BIIA. For medical testimony, Maphet and the L&I presented the testimony of Dr. Thomas Kelly and Dr. Greenleaf, and the County presented the testimonies of Dr. Clyde Farris and Dr. Eugene Toomey.

### A. MAPHET'S TESTIMONY

Maphet testified that she underwent a number of surgeries for her knee. Dr. Greenleaf performed the fifth surgery and after this surgery, her knee began to buckle. She claimed that after the ninth surgery to fix her patellofemoral instability, she "noticed a significant change" and she was not falling as much. Administrative Record (AR) Hr'g Tr. at 29-30. She believed that the problems she had with her patella were due to her original injury.

### B. KATHERINE DEFRANG'S TESTIMONY

Katherine DeFrang is a third party workers' compensation claims adjustor at Gallagher Bassett for the County. DeFrang testified that Gallagher Bassett authorized Maphet's first eight surgeries.

---

[1] In March 2015, Maphet fell due to her knee instability and sustained a concussion. The parties stipulated that if the industrial injury proximately caused the need for the ninth surgery, then the claim would also cover the concussion.

C. DR. KELLY'S TESTIMONY

Dr. Kelly is a chiropractic neurologist who does not perform surgery. Dr. Kelly reviewed Dr. Greenleaf's procedure notes and opined that the industrial injury in 2009 was the cause of patellofemoral instability, which led to the ninth surgery. He further opined that the scar tissue in that area could lead to the instability. Ultimately, Dr. Kelly deferred to the orthopedic surgeons as to the cause of the patellofemoral instability.

D. DR. GREENLEAF'S TESTIMONY

Dr. Greenleaf, an orthopedic surgeon, testified that on September 19, 2012, Maphet had stability in her knee, but she was still having pain particularly in the inside of the kneecap region. He performed the fifth surgery on Maphet's knee. This surgery consisted of the removal of scar tissue, a patella chondroplasty, and a limited lateral retinacular release. He performed the limited lateral retinacular release because when operating, he noticed that the patella was lateralized—i.e., the kneecap had been pulled "to the outside of the knee abnormally." AR Dep. of Greenleaf at 22. Dr. Greenleaf opined that the reason the kneecap shifted was due to the development of scar tissue and the original injury damaged the medial patellofemoral ligament and the medial collateral ligament, which allowed the scar tissue to pull the kneecap over.

Dr. Greenleaf testified that after the lateral retinacular release her kneecap began to move medially and subsequent surgeries were performed. He testified that the ninth surgery "was necessary to try to allow her knee to be stable through a full range of motion and prevent further injury with her falling." AR Dep. of Greenleaf at 28. Dr. Greenleaf believed the ninth surgery was due to the industrial injury and prior surgeries.

Dr. Greenleaf agreed that the treatment and diagnostic records from the years following the industrial injury showed the patellofemoral joint was stable and tracking normally. He also stated that about two years after the industrial injury, on August 25, 2011, he operated on Maphet's knee and noted that Maphet had "patellofemoral stability within normal limits." AR Dep. of Greenleaf at 45.

E. DR. FARRIS'S TESTIMONY

Dr. Farris is an orthopedic surgeon. Dr. Farris performed an independent medical evaluation (IME) of Maphet on January 13, 2015 and reviewed her medical records.

He stated that after the November 8, 2009 fall, Maphet's knee injury consisted of "a small defect in the medial compartment, and then an apparent tear of the lateral meniscus in the lateral compartment." AR Dep. of Farris at 18 (bold omitted). Dr. Farris said he would expect Maphet to have issues with her patellofemoral joint following the industrial injury if that was the cause of the patella instability, which she did not. He also testified that after the fifth surgery, where Dr. Greenleaf performed a lateral retanicular release, Maphet's main complaint switched to patellofemoral issues. When looking at the examinations leading up to the fifth surgery, Dr. Farris testified that there was no reasonable explanation for performing a limited lateral retanicular release.

Additional surgeries were conducted to address Maphet's patellofemoral instability. Dr. Farris opined that the ninth surgery was unnecessary because it is not possible to get her patella stability perfect, but he did state that the surgery could have made the instability better. He did not believe the patellofemoral problems could be attributed to the industrial injury.

5

F. DR. TOOMEY'S TESTIMONY

Dr. Toomey, an orthopedic surgeon, performed an IME on Maphet on July 9, 2015. He testified that there was no sign of patellofemoral instability until the fifth surgery and that several of the surgeries before the March 2015 surgery treated patellofemoral instability. Dr. Toomey opined that the ninth surgery was proper because she had patellofemoral instability. However, Dr. Toomey did not believe that the ninth surgery was performed to address a condition that was proximately related to the industrial injury.

G. BIIA'S RULING

The BIIA granted the County's motion to preclude testimony as to payment or authorization of treatment[2] pursuant to ER 409. The BIIA affirmed the L&I order and ruled that the industrial injury proximately caused the patellofemoral instability requiring the ninth surgery and that the surgery was proper and necessary.

III. TRIAL COURT

A. PRETRIAL

The County appealed the BIIA's decision to the superior court. The L&I moved for judgment as a matter of law under CR 50, and Maphet joined the motion. They argued that "as a matter of law, the industrial injury proximately caused the condition." Clerk's Papers (CP) at 107. The L&I further stated that because there was no issue of proximate cause, Maphet needed to prove only that the surgery was proper and necessary. The trial court denied the motion. The court found

---

[2] The BIIA ruled, "The motion to strike evidence of payment for treatment as evidence that the treatment is proper and necessary pursuant to ER 409 is granted pursuant to ER 409 and 401." AR at 86.

there was "a genuine issue of material fact" as to whether the industrial injury proximately caused Maphet's patellofemoral instability and that it was a question that should go to the jury. CP at 166.

Maphet moved to allow evidence that the County authorized and paid for Maphet's surgeries and argued that ER 409 did not apply. The L&I also argued that ER 409 did not apply to this case. The trial court did not exclude evidence of authorization of treatment, but it did exclude evidence of the County paying for Maphet's medical bills under ER 409. During DeFrang's testimony to the jury at trial, the trial court ruled that where the transcript said "paid," the reader would substitute "authorized."

B. JURY TRIAL

The parties tried the case before a jury. At the close of evidence, Maphet and the L&I moved for partial directed verdict. The motion was denied.

The jury verdict form contained two questions:

> QUESTION 1. Was the Board of Industrial Insurance Appeals correct in concluding that Jennifer Maphet's patellofemoral instability was proximately caused by the November 8, 2009, industrial injury and/or residuals therefrom?
> . . . .
> QUESTION 2. Was the Board of Industrial Insurance Appeals correct in deciding that Jennifer Maphet's March 20, 2015 [ninth] surgery was proper and necessary treatment?

CP at 190-91.

At closing, the County emphasized that this case focuses primarily on the proximate cause question. The County then stated, "Frankly I am not concerned about question two. And I will concede to you that there is sufficient evidence to say yes to that." 3 Verbatim Report of Proceedings (VRP) at 393.

7

Maphet then stated in her closing that the County had conceded that the ninth surgery was proper and necessary. The County objected. The trial court said that it was going to either move forward or declare a mistrial, and the County responded that it would address the issue in rebuttal.

On rebuttal, the County argued that the jury should answer "no" to the second question if they determine the ninth surgery was not related to the industrial injury. However, the County stated, "So my concession is she got better from the surgery but it's not work related." 3 VRP at 457.

The jury answered "no" to both questions. Maphet appeals; the L&I and the County cross appeal.

ANALYSIS

STANDARD OF REVIEW

In workers' compensation cases, our review is akin to our review of any other trial court decision. RCW 51.52.140; *Rogers v. Dep't of Labor & Indus.*, 151 Wn. App. 174, 179-81, 210 P.3d 355 (2009). We review the trial court's decision, not the BIIA's decision. *Butson v. Dep't of Labor & Indus.*, 189 Wn. App. 288, 296, 354 P.3d 924 (2015).

I. ER 409

As a threshold issue, the County argues in its cross appeal that the trial court erred when it found that evidence of authorization of medical treatment is not excluded under ER 409. Maphet and the L&I argue that the trial court did not err. We agree with Maphet and the L&I.

A. PRINCIPLES OF LAW

Interpretation of an evidentiary rule is a question of law that we review de novo. *Diaz v. State*, 175 Wn.2d 457, 462, 285 P.3d 873 (2012). We review a trial court's decision to admit or

exclude evidence for abuse of discretion. *Diaz*, 175 Wn.2d at 462. "A trial court abuses its discretion by misinterpreting a statute or rule." *Diaz*, 175 Wn.2d at 462.

When interpreting an evidence rule we use the same principles used to interpret the meaning of a statute. *Gourley v. Gourley*, 158 Wn.2d 460, 466, 145 P.3d 1185 (2006). First, we look to the plain language of the evidence rule and "[i]f the rule's meaning is plain on its face, the court must give effect to that plain meaning as an expression of legislative intent." *Gourley*, 158 Wn.2d at 466. ER 409 provides, "Evidence of furnishing or offering or promising to pay medical, hospital, or similar expenses occasioned by an injury is not admissible to prove liability for the injury."

B. THE TRIAL COURT DID NOT ABUSE ITS DISCRETION IN RULING THAT ER 409 DOES NOT EXCLUDE AUTHORIZATION EVIDENCE

Maphet moved in limine to reverse the BIIA's exclusion of evidence under ER 409 that Clark County authorized and paid for Maphet's surgeries. The L&I agreed. The trial court agreed with Maphet and the L&I that evidence of authorization was admissible, but ruled that evidence of payment of medical bills would be excluded under ER 409.

The County argues that the trial court erred because evidence of authorization of medical bills is inadmissible under ER 409 to prove whether the medical condition was proximately caused by the industrial injury. The County further argues that ER 409 applies to this case because liability is an issue in workers' compensation claims to determine whether an employer is responsible for a specific condition or specific treatment related to an industrial injury.

The County relies on the unpublished Division One case *Hull v. PeaceHealth Medical Group*, noted at 196 Wn. App. 1010 (2016), *review denied*, 187 Wn.2d 1020 (2017), for persuasive authority. In *Hull*, the trial court concluded that the BIIA "'erred in admitting evidence regarding

payment of services associated with defendant's thoracic outlet syndrome under Evidence Rule 409.'" 2016 WL 5373820, at *3. In a single sentence, Division One of this court held that the trial court correctly excluded evidence that the employer paid for surgeries under ER 409. *Hull*, 2016 WL 5373820, at *5.

In the single sentence in which the *Hull* court discussed ER 409, it never explained what evidence was before the court and how it related to the proceedings. Additionally, the court in *Hull* excluded evidence of "payment" but did not say that this applied to "authorization." 2016 WL 5373820, at *5. *Hull* is distinguishable from this case because it excluded evidence of "payment" but did not address the issue of whether "authorization" should be excluded under ER 409.

Even assuming ER 409 applies to workers' compensation cases, when looking to the rule's plain meaning, ER 409 applies to only "[e]vidence of furnishing or offering or promising to pay . . . to prove liability for an injury." ER 409 does not apply to evidence of authorization of treatment. Furthermore, in 2009, when this claim was allowed, it was already established that the County was liable for Maphet's industrial injury. The authorization evidence was not being used to show liability for an injury or that an industrial injury occurred in the first place. Therefore, we hold that evidence of authorization was admissible under ER 409, and the trial court did not err.

## II. TRIAL COURT'S DENIAL OF CR 50 MOTION

Maphet and L&I argue that the trial court erred when it failed to grant their motions for judgment as a matter of law. They provide two alternative reasons for why the trial court erred: they argue that as a matter of law, if a self-insured employer authorizes surgery for a condition, it has accepted that condition; and they argue that under the "compensable consequences doctrine,"

10

self-insured employers are responsible for the sequelae of treatment they authorize. The County argues that the trial court did not err because the authorization of surgery does not bind parties to industrial injury claims and the compensable consequences doctrine still requires a causal link between the industrial injury and the condition treated.

We agree that the trial court erred because based on the plain meaning of the rules if a self-insured employer authorizes surgery, it has accepted the condition. Additionally, the trial court erred because the compensable consequences doctrine applies to this case.

A. STANDARD OF REVIEW

CR 50 provides,

If, during a trial by jury, a party has been fully heard with respect to an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find or have found for that party with respect to that issue, the court may grant a motion for judgment as a matter of law against the party on any claim, counterclaim, cross claim, or third party claim that cannot under the controlling law be maintained without a favorable finding on that issue.

We review a trial court's CR 50 decision de novo. *Butson*, 189 Wn. App. at 296. "A CR 50 motion is properly granted when, 'viewing the evidence most favorable to the nonmoving party, the court can say, as a matter of law, there is no substantial evidence or reasonable inference to sustain a verdict for the nonmoving party.'" *Butson*, 189 Wn. App. at 296 (internal quotation marks omitted) (quoting *Davis v. Microsoft Corp.*, 149 Wn.2d 521, 531, 70 P.3d 126 (2003)).

1. ACCEPTANCE AND AUTHORIZATION

Maphet and the L&I rely on regulatory interpretation and the plain language of the Washington Administrative Code to argue that when an employer authorizes surgery it accepts the condition treated, and therefore the trial court erred in denying their motions. The County contends

that payment for the medical treatment of an industrial injury does not bind self-insured employers to industrial injury claims. We agree with Maphet and the L&I.

      a. PRINCIPLES OF LAW

We must liberally construe the provisions of the Industrial Insurance Act (IIA), Title 51 RCW, "for the purpose of reducing to a minimum the suffering and economic loss arising from injuries . . . occurring in the course of employment." RCW 51.12.010. "Courts are to resolve all doubts as to the meaning of the IIA in favor of coverage." *Murray v. Dep't of Labor & Indus.*, 192 Wn.2d 488, 501, 430 P.3d 645 (2018). "'An agency acting within the ambit of its administrative functions normally is best qualified to interpret its own rules, and its interpretation is entitled to considerable deference by the courts.'" *D.W. Close Co. v. Dep't of Labor & Indus.*, 143 Wn. App. 118, 129, 177 P.3d 143 (2008) (quoting *Pacific Wire Works v. Dep't of Labor & Indus.*, 49 Wn. App. 229, 236, 742 P.2d 168 (1987)).

The rules of statutory construction apply to administrative rules and regulations. *Dep't of Licensing v. Cannon*, 147 Wn.2d 41, 56, 50 P.3d 627 (2002). To determine the intent of a rule, the court first looks to the plain language of the provision. *Cannon*, 147 Wn.2d at 56. If a rule or regulation's meaning is clear on its face, we will give effect to that plain meaning. *Cannon*, 147 Wn.2d at 56. "Administrative rules and regulations are interpreted as a whole, giving effect to all the language and harmonizing all provisions." *Cannon*, 147 Wn.2d at 57. If a rule or regulation is ambiguous, we look to principles of statutory construction, legislative history, and case law to assist in interpreting it. *Cannon*, 147 Wn.2d at 57.

The IIA provides that an injured worker is entitled to "receive proper and necessary medical and surgical services" for conditions related to the industrial injury. RCW 51.36.010(2)(a); *Zavala*

*v. Twin City Foods*, 185 Wn. App. 838, 861, 343 P.3d 761 (2015). The L&I has adopted

regulations regarding a self-insured employer's role in providing treatment.

WAC 296-15-330(1) provides that self-insured employers must "[a]uthorize treatment and

pay bills in accordance with Title 51 RCW and the medical aid rules and fee schedules of the State

of Washington." WAC 296-20-01002 defines "acceptance, accepted condition," and

"authorization" as

> **[a]cceptance, accepted condition:** Determination by a qualified representative of
> the [L&I] or self-insurer that reimbursement for the diagnosis and curative or
> rehabilitative treatment of a claimant's medical condition is the responsibility of
> the [L&I] or self-insurer. The condition being accepted must be specified by one
> or more diagnosis codes from the current edition of the International Classification
> of Diseases, Clinically Modified (ICD-CM).
> . . . .
> **Authorization:** Notification by a qualified representative of the [L&I] or
> self-insurer that specific proper and necessary treatment, services, or equipment
> provided for the diagnosis and curative or rehabilitative treatment of an accepted
> condition will be reimbursed by the [L&I] or self-insurer.

### b. WAC 296-20-01002 AND RCW 51.32.190

Maphet and the L&I both rely on WAC 296-20-01002's definitions of "accepted

condition" and "authorization" to argue that when the County authorized a surgery, it accepted the

condition treated. Maphet and the L&I note that under WAC 296-20-01002's definition,

"acceptance" is a determination that a condition is the responsibility of the self-insured employer.

"Accepted condition" is defined as

> *[d]etermination by a* qualified representative of the [L&I] or *self-insurer* that
> reimbursement for the diagnosis and curative or rehabilitative treatment of a
> claimant's medical condition *is the responsibility of the [L&I] or self-insurer.*

WAC 296-20-01002 (emphasis added).

The definition of "authorization" references "accepted condition."  WAC 296-20-01002.

"Authorization" is

> [n]otification by a qualified representative of the [L&I] or self-insurer that specific proper and necessary treatment, services, or equipment provided for the diagnosis and curative or rehabilitative treatment *of an accepted condition will be reimbursed by the [L&I]* or *self-insurer.*

WAC 296-20-01002 (emphasis added).  Authorization is the self-insured employer's notification that it will provide treatment for an accepted condition.  Based on the plain meaning of these definitions, there first must be an "acceptance" before "authorization."  If the self-insured employer authorizes a surgery, the self-insured employer has accepted the condition.  Thus, when the County authorized the sixth, seventh, and eighth surgeries to treat patellofemoral instability, it "accepted" the condition and therefore was responsible for the ninth surgery, which addressed the same condition.

If a self-insured employer wants to contest acceptance, the employer can decline to authorize the treatment.  *See* RCW 51.32.055(6); WAC 296-15-330.  Here, instead, the County authorized the sixth, seventh, and eighth surgeries, which treated patellofemoral instability.

The County makes a policy argument that if every employer who authorizes treatment is then automatically liable for any condition treated by that benefit, this would incentivize employers to deny or dispute treatment benefits "because if they pay for the wrong procedure, the financial consequences could be massive."  Br. of Resp't at 38.  Both in its briefing and at oral argument before this court, the County suggested it performs little to no due diligence of the propriety of a claim before processing it.  Washington Court of Appeals oral argument, *Clark County v. Maphet*, No. 51170-3-II (Apr. 4, 2019), at 27 min., 35 through 55 sec.  According to the County, self-insured employers routinely pay for medical treatment for injuries unrelated to an industrial injury

14

as a "default" position, with the expectation that the "legal and adjudicative process will work itself out in due time." Br. of Resp't at 38. The County argued that an interpretation of the rule such as the one proposed by Maphet and the L&I would require it to scrutinize medical documentation more carefully in future adjudications of claims, which would harm workers. Washington Court of Appeals oral argument, *supra*, at 27 min., 35 through 55 sec. The L&I responded that when the L&I processes claims, it "looks at medical records quite carefully" and such due diligence is "101 workers comp claim adjudication." Washington Court of Appeals oral argument, *supra*, at 33 min., 38 through 43 sec.

We agree with Maphet and the L&I. Self-insured employers have the responsibility to challenge treatment before authorization if there is a question as to whether treatment should be provided. The IIA aims to give priority to workers by providing relief for their injuries. *Murray*, 192 Wn.2d at 501; RCW 51.04.010; RCW 51.12.010. An employee should not be left to guess whether a condition will be covered. And as the L&I points out, a self-insured employer may authorize treatment only for conditions proximately caused by the industrial injury and conditions related to treatment provided under the claim. The County's policy argument fails.

The County relies on RCW 51.32.190 to argue that it is not bound to accept a condition when it pays for treatment. RCW 51.32.190(2) and (4) provide,

> Until such time as the [L&I] has entered an order in a disputed case acceptance of compensation by the claimant shall not be considered a binding determination of his or her rights under this title. Likewise, the payment of compensation shall not be considered a binding determination of the obligations of the self-insurer as to future compensation payments.
> . . . .
> If, after the payment of compensation without an award, the self-insurer elects to controvert the right to compensation, the payment of compensation shall not be considered a binding determination of the obligations of the self-insurer as to future compensation payments. The acceptance of compensation by the worker

or his or her beneficiaries shall not be considered a binding determination of their rights under this title.

But RCW 51.32.190 does not apply to this case. RCW 51.32.190 applies to the payment of compensation, and treatment is not compensation because compensation includes wages and monetary remuneration while treatment includes the care provided to return a worker to a fixed and stable condition. The definition of "payment of compensation" under WAC 296-15-340 only refers to time loss compensation. S*ee also* RCW 51.08.178 (defining "'Wages'—Monthly wages as basis of compensation"); RCW 51.36.010 (laying out the treatment guidelines.) Thus, the IIA differentiates between compensation and treatment and RCW 51.32.190 does not apply.

The County's argument, based on RCW 51.32.190, fails because RCW 51.32.190, by its plain language, does not apply to the issue presented in this case. This case involves more than just payment for treatment—it involves the County authorizing the surgeries. Additionally, under the IIA, treatment is not compensation.[3]

Here, it is undisputed that the County authorized the sixth, seventh, and eighth surgeries. The County's witnesses agreed that these three surgeries treated patellofemoral instability. The evidence shows that Maphet's ninth surgery treated patellofemoral instability, the same condition addressed by the surgeries that the County had previously authorized. Therefore, based on the plain meaning of these rules, when the County authorized Maphet's sixth, seventh, and eighth

---

[3] The County also cites to RCW 51.32.210 and .240 to argue that the statutory scheme supports the County's argument that "payment of benefits does not bind parties to industrial injury claims." Br. of Resp't at 34. We find the County's reliance on RCW 51.32.210 and .240 by analogy unpersuasive because those statutes address highly specific circumstances that are factually distinguishable from this case.

surgeries to treat the patellofemoral instability, it accepted Maphet's condition. Thus, we hold that the trial court erred in not granting Maphet's and the L&I's CR 50 motion.

2. COMPENSABLE CONSEQUENCES DOCTRINE

Maphet and the L&I also argue that the trial court erred in denying their motions for judgment as a matter of law because the compensable consequences doctrine applies, which makes the County, the self-insured employer, responsible for the consequences of its authorized treatment. We conclude that the compensable consequences doctrine applies here.

a. PRINCIPLES OF LAW

Washington has recognized the rule, referred to as the compensable consequences doctrine, which establishes that if treatment performed for an industrial injury causes complications or aggravates the injury, the claim covers the sequelae of treatment. *See Anderson v. Allison*, 12 Wn.2d 487, 496, 122 P.2d 484 (1942); *Ross v. Erickson Constr. Co.*, 89 Wash. 634, 647, 155 P. 153 (1916). The aggravation by malpractice or negligence does not become an intervening cause but is still incidental to the original injury. *Anderson*, 12 Wn.2d at 492; *Yarrough v. Hines*, 112 Wash. 310, 313, 192 P. 886 (1920).

b. THE COMPENSABLE CONSEQUENCES DOCTRINE COMPELS COVERAGE

Both Maphet and the L&I argue that the compensable consequences doctrine applies to this case because Dr. Greenleaf performed an "unnecessary surgical action" during Maphet's fifth surgery, which led to the need for the sixth, seventh, eighth, and ninth surgeries. L&I Br. of Resp't at 26. Maphet and the L&I both rely on *Ross* and *Anderson* to support their argument that the employer is responsible for Maphet's ninth surgery.

17

In *Ross*, the court addressed the issue of medical malpractice committed when treating a worker for an industrial injury. 89 Wash. at 635. The court determined that the then 1911 IIA, *Laws of* 1911, ch. 74, preempted all common law remedies. *Ross*, 89 Wash. at 640. The court stated, "When a workman is hurt and removed to a hospital, or is put under the care of a surgeon, he is still, within every intendment of the law, in the course of his employment and a charge upon the industry, and so continues as long as his disability continues." *Ross*, 89 Wash. at 647. Thus, the court held that the injuries as well as the aggravations of those injuries due to the malpractice were within the act because they were "proximately traceable to the original hurt." *Ross*, 89 Wash. at 648.

Similarly, in *Anderson*, the court addressed this doctrine under the Federal Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. § 933. 12 Wn.2d at 488. Anderson was injured at work and during treatment, his injuries were aggravated due to medical malpractice. *Anderson*, 12 Wn.2d at 488. The court concluded that "the aggravation by malpractice of an injury does not become an intervening cause of damages, but is incidental to the original injury." *Anderson*, 12 Wn.2d at 492.

The County argues that *Ross* is distinguishable from this case. The County contends that *Ross* still has a requirement that the underlying condition being treated must be proximately related to the original industrial injury. In *Ross*, the underlying condition was proximately related to the industrial injury. Here, the County contends that the fifth surgery, when Dr. Greenleaf performed a limited lateral retinacular release, was not proximately related to the industrial injury and therefore, the employer should not be responsible for the subsequent surgeries.

We disagree with the County because the court in *Ross* said, "When a workman is hurt and removed to a hospital, or is put under the care of a surgeon, he is still, within every intendment of the law, in the course of his employment and a charge upon the industry." 89 Wash. at 647. Additionally, *Ross* provides that a doctor's malpractice or negligence cannot be an intervening cause. 89 Wash. at 647.

Here, the ninth surgery was proximately caused by the residuals of previously authorized surgeries, and Maphet sought the previous surgeries for treatment of the industrial injury. The County authorized the fifth surgery where Dr. Greenleaf released the tendon that led to the patellofemoral condition. The County agreed that when Dr. Greenleaf performed the fifth surgery, it was a surgery to remove scar tissue that resulted from the injury and during this fifth surgery, Dr. Greenleaf also released the tendon. Maphet had the fifth surgery because the County authorized that surgery; the fact that the doctor performed a release during that surgery that led to complications is a consequence of that authorized surgery.

The County again relies on the unpublished case *Hull* for its argument. In *Hull*, Division One of this court held that Hull's work activities caused thoracic outlet syndrome, and therefore "the downstream consequence of her surgery [for thoracic outlet syndrome] are also covered." 2016 WL 5373820, at *5. Based on this, the County argues that the court in *Hull* still requires a causal connection between the conditions being treated and the industrial injury.

We do not find *Hull* persuasive because *Hull* did not address the issue before us. The court in *Hull* addressed whether there was substantial evidence to support "the trial court's finding that Hull's thoracic outlet syndrome and its sequelae did not arise naturally and proximately from her employment." 2016 WL 5373820, at *5. Additionally, the holding in *Hull* appears to support the

position that if an authorized surgery that is proximately caused by the industrial injury causes complications, then an employer is responsible for the downstream consequences of that surgery.

In addition to case law establishing the "compensable consequences doctrine," all of the parties rely on BIIA decisions. The BIIA has designated only *In re Arvid Anderson*[4] as significant under RCW 51.52.160[5] and WAC 263-12-195.[6] "While administrative decisions are not binding on this court, we recognize significant decisions of the Board as persuasive authority in interpreting the IIA." *Dep't of Labor & Indus. v. Lyons Enters., Inc.*, 186 Wn. App. 518, 535 n.8, 347 P.3d 464 (2015), *aff'd*, 185 Wn.2d 721, 374 P.3d 1097 (2016).

Maphet relies on *Anderson*. In *Anderson*, the worker had surgery for an industrial injury and the treatment caused cardiac arrhythmia. 1986 WL 31849, at *1. The Board relied on *Anderson* and *Ross* to ultimately conclude that the employer was responsible for the cardiac arrhythmia because "[i]t is, of course, settled law that the consequences of treatment for an industrial injury are considered to be part and parcel of the injury itself." *Anderson*, 1986 WL 31849, at *1; *see In re Jose M. Rivera*, 1998 WA Wrk. Comp. LEXIS 676, at 2 (Wash. Bd. of Indus. Ins. Appeals Apr. 27, 1998) ("if [the L&I] authorized the surgery without limitations, [the L&I] will be bound by its authorization"); *In re Willma J. Lee*, 2009 WL 6268440, at *8 (Wash.

---

[4] 1986 WL 31849 (Wash. Bd. of Indus. Ins. Appeals July 22, 1986).

[5] RCW 51.52.160: "The board shall publish and index its significant decisions and make them available to the public at reasonable cost."

[6] WAC 263-12-195(1): "The board's publication '*Significant Decisions*,' prepared pursuant to RCW 51.52.160, contains the decisions or orders of the board which it considers to have an analysis or decision of substantial importance to the board in carrying out its duties."

Bd. Indus. Ins. Appeals Aug. 4, 2009) ("[o]nce the [L&I] pays for a surgery, any residuals of the surgery must be found to be industrially related").

The County argues that *Anderson* is distinguishable from this case. The County emphasizes that in *Anderson*, the neck surgery was related to the injury and the cardiac condition was related to the surgery. Therefore, the County contends that the employer was responsible for the heart condition because it was proximately caused by the treatment of a condition proximately related to the industrial injury. The County argues that *Anderson* does not stand for the proposition that the employer is responsible for a medical condition if it authorized any treatment for that condition, even if the condition was not caused by the initial industrial injury. We disagree based on the conclusion in *Anderson* that "the consequences of treatment for an industrial injury are considered to be part and parcel of the injury itself," if an employer authorizes treatment and something goes wrong, the employer is responsible for the consequences of that treatment. 1986 WL 31849, at *1.

In light of binding authority, *Ross* and *Anderson*, and in looking at the BIIA decision for persuasive authority, we agree with Maphet and L&I that under the compensable consequences doctrine, the County authorized the fifth surgery and is therefore responsible for the consequences flowing from that surgery. Here, it is undisputed that the County authorized the fifth surgery to remove scar tissue related to the injury. During this surgery, Dr. Greenleaf chose to release Maphet's tendon. This release was a consequence of the authorized surgery and it subsequently led to the need for the ninth surgery to treat the patellofemoral instability condition. We hold that the compensable consequences doctrine applies.

## II. CONCESSION AS TO PROPER AND NECESSARY TREATMENT

Maphet and the L&I argue that the County conceded the issue of whether the ninth surgery was proper and necessary.[7] The County claims that Maphet and the L&I must point to a formal stipulation before this court can find a concession.

We agree with Maphet and the L&I that the County conceded this issue. CR 2A, the civil rule for stipulations, provides that "[n]o agreement or consent between parties or attorneys in respect to the proceedings in a cause, the purport of which is disputed, will be regarded by the court unless the same shall have been made and assented to *in open court on the record*." (Emphasis added.)

Here, the County conceded this issue in open court in front of the jury. At closing, the County emphasized that this case focuses primarily on the proximate cause question. The County stated during closing, "Frankly I am not concerned about question two. And I will concede to you that there is sufficient evidence to say yes to that." 3 VRP at 393.

Maphet then stated in her closing that the County conceded that the jury should answer yes to the second question, whether the ninth surgery was proper and necessary. The County objected to this. The trial court said that they were going to either move forward or declare a mistrial, and the County responded that it would address the issue in rebuttal. During the County's rebuttal closing argument, when referring to the ninth surgery, counsel said, "Yes, it was curative." 3 VRP at 460. The County also explained,

---

[7] We note that WAC 296-20-01002 provides that authorization is the "[n]otification by a qualified representative of the [L&I] or self-insurer that specific *proper and necessary* treatment, services, or equipment provided for the diagnosis and curative or rehabilitative treatment of an accepted condition will be reimbursed by the [L&I] or self-insurer."

> So let's be clear on my concession in this case. We have disputed proximate cause throughout this entire—entire claim—throughout this entire appeal with regard to that particular issue. So my concession is she got better from the surgery but it's not work related.

3 VRP at 457. The County said that the jury should answer "no" to the second question if they determine the March 20 surgery was not related to the industrial injury.

Thus, we conclude that the County conceded that the surgery was proper and necessary because the County stated there was sufficient evidence to say the surgery was proper and necessary and then later stated the surgery was "curative" and "she got better from the surgery." 3 VRP at 457.

## IV. ATTORNEY FEES

Maphet argues that if she prevails on at least one issue, she is entitled to reasonable attorney fees and costs under to RCW 51.52.130 and RAP 18.1. The County does not address this argument.

Under RAP 18.1(a), if applicable law allows, we may grant attorney fees on appeal. "RCW 51.52.130(1) requires a court to award a worker attorney fees if he or she improves their position on appeal." *Masco Corp. v. Suarez*, 7 Wn. App. 2d 342, 352, 433 P.3d 824, *review denied*, 193 Wn.2d 1015 (2019). Here, Maphet prevails, and thus we award Maphet attorney fees conditioned upon her compliance with RAP 18.1(d).

## CONCLUSION

We hold that evidence of authorization is not excluded under ER 409. We additionally hold that the trial court erred in denying Maphet's and the L&I's CR 50 motions because as a matter of law, the County accepted the patellofemoral instability condition when it authorized the sixth, seventh, and eighth surgeries; the compensable consequences doctrine compels coverage of

No. 51170-3-II

the ninth surgery; and the County conceded that the ninth surgery was proper and necessary. Accordingly, we reverse.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

CRUSER, J.

We concur:

WORSWICK, J.

LEE, A.C.J.